### GALVESTON, H. & S. A. RY. CO. v. WIEMAR. (No. 7909.)

Court of Civil Appeals of Texas. San Antonio. March 7, 1928.

1. **Appeal and error** ⊝⟿1001(1)—**Verdict for yard switchman in personal injury action against railroad held to be reversed, in view of improbable testimony.**

In yard switchman's action against railroad for injuries in switching car through "flying" movement, brought almost 2 years after accident, testimony of plaintiff *held* so improbable and contrary to obvious facts that verdict for plaintiff should be set aside on appeal as contrary to evidence, where plaintiff's testimony was contrary to voluntary and deliberate reports made at time of accident.

2. **Appeal and error** ⊝⟿999(1)—**Reviewing court should not set aside verdict of jury unless it is unconscionable.**

Power of Court of Civil Appeals to set aside verdict of jury should never be exercised except in extreme cases where verdict is so contrary to preponderance of testimony or is in such obvious conflict with justice of case as to render it unconscionable.

Appeal from District Court, Victoria County; John M. Green, Judge.

Action by G. W. Wiemar against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellant.

I. D. Fowler and Fly & Ragsdale, all of Victoria, for appellee.

SMITH, J. This suit was instituted on January 9, 1926, by G. W. Wiemar against the Galveston, Harrisburg & San Antonio Railway Company, to recover $40,048.36 damages alleged to have been sustained by Wiemar as a result of injuries received by him in an accident occurring in the railway company's switch yards, in the city of Victoria, on January 11, 1924. Wiemar was at the time a yard switchman. The cause was submitted to a jury upon a general charge, and in response to the verdict judgment was ren-

dered in favor of Wiemar for $3,062.50. The railway company has appealed.

The alleged accident occurred in a switching movement of a string of 22 cars, pulled by a switch engine. The rear car in the string was an oil tank car, and appellee was instructed by the yardmaster to cut off this car from the string and spot it in the clear just west of Cameron street. This was done through a "flying" movement; that is to say, the tank car was uncoupled while the train was moving, was then permitted to follow under its own momentum in the wake of the still moving train, and was brought to a stop at the designated spot by appellee's use of the hand brake on the rear end of the detached car. According to appellee's written statements made at the time, as well as his testimony upon the trial, he first uncoupled the tank car about 150 feet short of its destination, but through some mishap it came back into contact with the cars ahead of it, and automatically recoupled into them; whereupon appellee, for the second time, uncoupled it, when the train moved forward, followed under its own momentum by the detached car, still manned by appellee, who applied the hand brake and brought it to a stop at the designated spot.

The movement in which appellee claims to have been injured occurred at about 10:30 on the morning of January 11, 1924. He continued to perform his work through that day, but filled out the usual "accident or personal injury report" blank and sent it in to his superiors. In this blank, among immaterial data, he stated that at the time of the accident the train was "pulling ahead" on "level track," on a "curve," in a "cut," at a speed of 4 miles per hour; that after the accident he "remained on job"; that he had no "medical or surgical attendant"; that the "kind of accident" was "personal injury"; that the "nature and extent of injuries" was "back wrenched"; that he did not know cause of accident or of his injury; and that the accident could not have been "avoided." In answering the printed question, "Detail of, cause, and nature of accident," appellee stated in the blank:

"While pulling in yard from long siding I pulled pin on car VCPX 616 which was last in cut. After I had pin pulled slack run out, and I pulled it again, and I couldn't straighten out for pain in my back. I don't know what caused it."

Five days later, on January 16, appellant's superintendent wrote appellee and requested him to furnish more complete details of the occurrences referred to in his accident report. To this inquiry appellee replied, on January 20:

"Victoria, Texas, 1—20—24.

"Mr. A. D. Mims, Supt., Victoria, Texas— Dear Sir: Yours of the 16th just to hand, and

in reply will try to explain fully just how I wrenched my back.

"On January 11, 1924, at about 10:30 a. m. we pulled about 22 cars from the Long Siding, into the yard. The yardmaster instructed me to cut off the rear car, which was empty tank car, VOPX 616, and hold to clear track No. 1 on the outside track. Now, in order to cut this car off, it was necessary for me to get on the ground, for the reason that the sill step, grab-irons and handrails on this car are out of reach of the pin lifter. I cut this car off and gave a proceed signal and started to the other end of the car to set a brake. Before I got to the brake, the engineer slowed down and caused this car to roll to a coupling. The engineer immediately started out again, and I run up and got the pin again, and when I started to get on the car to set a brake, I had a pain in my back, which was so severe that it was only with difficulty that I set the brake to stop the car. I continued work for the rest of the day, but immediately after work I went to Dr. Hopkins, who prescribed a liniment for me which I am using. I could not work from then until the 16th, on account of lameness and pain, but on the 16th, I returned to work as the pain was a great deal better and at this time is only felt at intervals. After the second day the pain localized to the right hip, before that it was in the spine and both hips. I think the above covers all and is correct to the best of my knowledge and belief.

"Respectfully yours,
"G. W. Wiemar, Switchman."

Two years later—and one day before his cause of action would have been barred by the statute of limitation—appellee filed this suit, and upon the trial, about a year later, was the only witness who testified concerning the occurrence. It is deemed unnecessary to state his testimony except as it relates to the process of coupling, recoupling, and again uncoupling the tank car from the string of cars to which it was attached. He testified: That the switch engine set out with the string of 22 cars, towards Cameron street, and he was riding the tank car at the rear. That when this movement reached a point where the tank car was about 150 feet from Cameron street, where it was to be spotted, the train was moving at a speed of 12 or 15 miles an hour. It was time for him to uncouple the tank car from the next car ahead; and, as he could not do this from a position on the car, he got off the car and onto the ground, ran ahead with the train movement until he caught up with the head end of his car, pulled the pin, uncoupled the cars, and signaled the engineer to "go ahead," which he did. That he then climbed back on the detached car, and started "working his way" along the running board on the side of the car, back towards the hand brake at the rear end of the car. That in the meantime, without his knowledge, the train ahead came to a sudden stop, and his car, moving under its own momentum violently collided with the train. That at the moment of the impact he had reached a point on the running board

about half the length of the car. That the collision "was an awful jolt that threw me down against the rail, and I could not straighten out and was in great pain; * * * in order to keep myself from falling, I grabbed the rail that goes around the tank, and it twisted my feet around under me and wrenched my back, * * * and I was so crippled up I did not know what the deuce had happened; it was more pain than I ever had in my life; that pain has been with me from that time until now; I have it right now; it is not as severe as at the time of the accident, and it is more severe than it was a year ago." That this collision resulted in recoupling the detached car to those ahead of it, making it necessary to again uncouple the tank car in order to spot it as planned, and immediately after the collision appellee started back along the running board toward the front end of the car to effect the uncoupling. "I finally got to the end of the car," he testified, "and stepped on the box car ahead and got the pin on the box car, because I could not make it to the pin on the oil car, because I would have had to outrun the car on the ground, and I could not hardly walk I was in such pain; my inability to get the pin on the oil car was due to this pain in my legs and back caused by the wrench I got when I grabbed hold of the hand rail; I was too weak. Then I went and got back on the oil car without giving any signal and set the brakes and let them get away from it after the second time, and after I got the car stopped I got off. * * *" Appellee's claim of his present condition is fairly summarized in this excerpt from his testimony:

"As to my physical condition in that respect since receiving the injury will say that, if I get into a certain position for any length of time and try to straighten out, I always have pain in my back and legs, and my legs have an awful feeling for hours at a time, and I cannot sleep, but roll around in bed and twist and cannot sleep, and I have headaches; lots of nights I do not get over two hours sleep. That condition started right after the accident, and it is becoming more severe right along."

[1] This court is called upon to uphold, by its deliberate judgment, the verdict of the jury in favor of appellee which is founded upon the record we have undertaken to fairly set out. Appellant contends earnestly and vigorously that appellee's own voluntary and deliberate report and statement made at the time of the alleged accident, the inconsistencies and incongruities in his own testimony upon the trial, and the physical facts of the case render his testimony so improbable and so contrary to the obvious facts of the case that it cannot support the verdict; that the verdict is contrary to the overwhelming preponderance of the evidence, requiring that it be set aside. We are constrained to sustain this contention. It was appropriately said by Judge Gaines, in Mis-

souri Pac. R. Co. v. Somers, 78 Tex. 439, 14 S. W. 779, a case similar in principle as well as in facts to this one, that:

"Such being the evidence, we feel constrained to hold that the court below should have granted a new trial upon the motion of the defendant. Although this court has the power to review a case upon the facts, and to set aside a verdict which has evidence to support it, that power has ever been reluctantly exercised. But it is the right and duty of the court to set aside a verdict when it is against such a preponderance of the evidence that it is clearly wrong. Willis v. Lewis, 28 Tex. 185; Dimmitt v. Robbins, 74 Tex. 441 [12 S. W. 94]. The plaintiff was contradicted by two disinterested witnesses; on two different trials he gave two inconsistent versions of the facts upon a most material point, and gave a very unsatisfactory explanation of the inconsistency. There was no evidence to support his case but his own. It seems to us, therefore, that the jury must have been controlled in their verdict more by their sympathy for a hard-working, zealous man, injured in a dangerous employment, than by the law of the case as applied to the evidence."

Other cases cited by appellant, and deemed in point, are San Antonio & Aransas Pass Ry. Co. v. Bolster (Tex. Civ. App.) 51 S. W. 41; American N. I. Co. v. Fulghum, (Tex. Civ. App.) 177 S. W. 1008; Houston & Texas Central R. Co. v. Schmidt, 61 Tex. 282; Kohlberg v. Awbrey (Tex. Civ. App.) 167 S. W. 831; Short v. Kelly (Tex. Civ. App.) 62 S. W. 944; Gulf W. T. & P. Ry. Co. v. Abbott, 147 Tenn. 433, 248 S. W. 299; Hines v. Roan (Tex. Civ. App.) 230 S. W. 1082; Texas E. Ins. Co. v. Herring (Tex. Com. App.) 280 S. W. 741.

We deem it appropriate to consider the record further as it relates to the conclusion stated. It will be recalled that within a day or two following the accident, appellee made out a brief report of the occurrence and turned it in to his superiors. A few days later he wrote appellant's superintendent, giving the circumstances of the accident and a description of his injuries in detail. These statements were not made by appellee under whip and spur, or under any other influence calculated to confuse, mislead, or overreach him. He made them voluntarily and deliberately, in his own time and method, in his own handwriting, without aid or suggestion from any other source, and, apparently, in the privacy of his own apartment. The first was made while he was laying off as a result of his alleged injuries, and the second a few days later, after he had returned to his work. Both were made while the facts were necessarily fresh in his mind, and when, according to his testimony upon the trial, the very symptoms and conditions of which he now complains had fully developed and manifested themselves.

In these statements appellee made no claim or mention of any collision or other violent or unusual movement of the train or of the tank car. In his first statement he described the whole immediate movement out of which he then claimed and now claims the accident occurred, by saying that after he pulled the coupling pin the first time "the slack run out and I pulled the pin again." From this statement the obvious inference is that the recoupling, which he now claims resulted from a terrific collision, was in fact caused by the slack running out of the train, thus excluding the theory of a violent collision. In his letter giving a detailed report of the occurrence he not only made no claim or mention of a violent collision, but again excluded that theory by stating that after he had uncoupled the cars the first time "the engineer slowed down and caused this car to roll to a coupling." But upon the trial three years later appellee testified, and he recovered solely upon the theory, that the accident and his injury resulted from a terrific collision, caused by a sudden stopping of the train ahead, when his car, running at a speed of 12 or 15 miles an hour, crashed into the cars ahead; that this collision resulted in "an awful jolt that threw me down against the rail, and I could not straighten out and was in great pain; * * * in order to keep myself from falling I grabbed the rail that goes around the tank, and it twisted my feet around under me and wrenched my back * * * and I was so crippled I did not know what the deuce had happened; it was more pain than I ever felt in my life." It is quite obvious that this testimony is in direct and vital conflict with appellee's previous statements of the occurrence, made at a time when he knew when, how, and in what movement or operation he received his injury. If there was a violent collision, he, of course, knew it when he made those statements, whereas he not only omitted from them any reference to the fact, but excluded the possibility of it by setting out other facts contrary to its existence. The claim now made, that the accident occurred and he received his injury as a result of a violent collision, is further refuted by the statements made in his first report, that, first, he did not know what caused "the accident," and, second, that he did not know what caused the "pain" to come in his back. If the injury or accident was caused by a "terrific collision" or "awful jolt" of the cars, immediately manifested by excruciating pain, as he claimed for the first time when he filed his suit, two years thereafter, then that cause was, of course, fully realized by him at the moment, and that claim is in irreconcilable conflict with his deliberate and voluntary statements made at the time, that he did not know what caused the accident or the injury. If this conflict needs the support of a motive to make it material, that motive is inferable from the record. For, if the written statements made at the time, or the deducible in-

ferences therefrom, were true, there was no apparent negligence upon the part of appellant, but if those statements and inferences were not true, and appellee's testimony in conflict therewith was true, then appellant could well be held negligent. The statements were made at a time when appellee apparently had no thought of a suit, and could have no motive for misstating the facts, whereas his testimony was given in support of a suit for $40,000 in damages.

Another conflict, equally vital, relates to the specific movement which resulted in the alleged accident. In his written statements appellee claimed that his injury was coincident with, or rather immediately followed, the *second* uncoupling of the cars. In his testimony he fixed the time and occasion of the injury upon the *recoupling* of the cars. In his first report of the accident he stated that after he uncoupled the cars the first time the "slack run out and I pulled (the coupling pin) *again*, and I couldn't straighten out for pain in my back. I don't know what caused it." In his second report, or letter, he stated that he uncoupled the tank car the first time "and started to the other end of the car to set a brake. Before I got to the brake the engineer slowed down and caused this car to roll to a coupling. The engineer immediately started out again, and I run up and got the pin *again*, and when I started to get on the car to set a brake I had a pain in my back which was so severe that it was only with difficulty that I set the brake to stop the car." These two statements are consistent. In each appellee plainly says that he uncoupled the cars the first time, that the cars came back together and recoupled, that he then uncoupled them the second time, and that the pain struck him when he pulled the coupling pin the second time. It appears affirmatively in his letter that, in order to effect the second uncoupling, appellee had to get on the first car ahead of the tank car and from that vantage point reach out, or down, and while in that position work a lever and thereby lift the coupling pin; that when he worked the lever and started to straighten up a pain struck him in the back, making it difficult for him to recover an upright position. Thus he irrevocably fixed the time and occasion of his injury upon his effort to *uncouple* the cars the second time. In his testimony upon the trial, as has been previously shown, however, he fixed the time and occasion of his injury upon the *recoupling* of the cars, which, he testified, resulted from a violent collision between the tank car and the train ahead of it. The conflict between his written statements upon the one hand, and his testimony upon the other, is clear, irreconcilable, and vitally material. If he received his alleged injury in a violent recoupling of the cars, he knew it, of course, when he made his voluntary statements a few days thereafter,

and yet in those statements he not only made no claim of injury at the time of that movement, or because of it, but affirmatively asserted, consistently in both statements, that he received his injury at a different time, in a different movement, and, moreover, did not mention the fact of a violent collision, but negatived the existence of that fact. The claim made in his testimony, that he was injured when the cars recoupled with a violent collision, is further refuted by his written statements made at the time, that he did not know what caused the accident, or what caused the pain to come in his back. This claim of ignorance, of course, is consistent with the other statement made in both of his written statements, that the pain came in his back when he started to "straighten out" after reaching down and pulling the pin the second time; it is wholly inconsistent with his testimony that he received his injury, and that the injury was instantly manifested, when the cars recoupled with a violent collision. These conflicts are irreconcilable. The presence of a motive is again inferable, for, if the injury came upon appellee in the manner and under the circumstances described in his former statement, appellant apparently would not be liable; whereas, under his testimony, its liability is apparent.

In his report of the accident appellee stated that the train was moving at a speed of 4 miles an hour when the several incidents occurred. In his letter giving the details of the accident he did not state what the speed was. But upon the trial he testified, repeatedly, that the movement was made at a speed of 12 to 15 miles an hour. Since it does not appear that the speed has much, if any, bearing upon the accident, this inconsistency becomes unimportant. But the claim of high rate of speed does become important in testing the weight of appellee's testimony of other facts. For instance, he says that when the time came for him to pull the uncoupling pin the first time, he got down off the tank car and onto the ground, ran along with the train (which was making 12 or 15 miles an hour) until he caught up with and got opposite the lever on the car ahead of the tank car, and, keeping pace with the train movement, reached in, caught the lever, and pulled the pin. He insisted that throughout this whole process, including the time he was outrunning the train, it was moving at from 12 to 15 miles an hour; that it continued to maintain this speed while he climbed back on the tank car, worked his way along the running board on the side of the car, suffered his injury, worked his way forward, crossed over to the car ahead, and, again uncoupling the cars, got off the car ahead and back onto the detached car, set the brakes on it, and brought it to the final stop. He stated also, and reiterated it several times, that this whole chain of incidents and movements occupied no more than 45 seconds, or a minute, of his

time, and gave that fact as an explanation of his failure in his written statements to mention the collision, and also of his statements that he was injured when he uncoupled the cars the second time, instead of in the recoupling.

Appellee admitted upon the trial that the statements made by him shortly after the accident were true and correct, and sought vainly to reconcile them with his testimony and avoid the force of the conflicts. But those conflicts are irreconcilable and go to the very foundation of appellee's case. If the several statements had been made by different witnesses, each confronting the jury and giving a different version of the facts, the question would have been solely for the jury to resolve in its discretion. But these different versions were given by the same witness, twice in written statements made just after the matters transpired, and once in person three years later. The jury had no means of contrasting the weight of the several statements and, under the circumstances of the case, had no power to resolve the irreconcilable conflicts by arbitrarily rejecting as untrue the previous written statements and embracing the oral testimony as the truth, the whole truth, and nothing but the truth.

There are other inconsistencies between appellee's written statements, his testimony at the trial, and the physical facts of the case, and other incongruities are presented in his own testimony. But those we have discussed, relating as they do to the vitals of appellee's case, are deemed sufficient to discredit the verdict, at least as it relates to liability. Especially is this true in view of the fact that appellee was the sole witness upon that branch of the case.

The evidence of appellee's alleged injury is equally unsatisfactory. When analyzed, it is found to rest alone upon his own testimony, and is negatived by a great preponderance of the competent evidence in the case. The accident occurred at about 10:30 on the morning of January 11. Appellee stated in his accident report that he "remained on the job" through the day of the accident. In his letter of January 11 he stated that he "continued work for the rest of the day." Upon the trial, however, he testified that after the accident, and after he had spotted the tank car, he walked on up to the front of the train, "caught up with the engine, stayed in the engine, and did not do any more work that day" on account of the pain he was in. In his letter of January 20th he stated that, "after working the rest of the day," he went to Dr. Hopkins, the company doctor, "who prescribed a liniment for me which I am using. I could not work from then until the 16th, on account of lameness and pain, but on the 16th I returned to work, as the pain was a great deal better and at this time is only felt at intervals. After the second day

the pain localized to the right hip, before it was in the spine and both hips. I think the above is all and is correct to the best of my knowledge and belief." Resuming work on the 16th, appellee continued in that work steadily until some time in the following August when he was in another accident, as a result of which he was thrown from the top of a box car to the ground, a distance of 14 or 15 feet, lighting on his feet. As a result of this accident he laid off from work for a period of 18 days. His claim on account of this accident was settled by the company, and at the end of the 18-day lay off, he resumed his work, and continued steadily at it until some time in the following March, about 14 months after the accident upon which this suit is based. So far as this record shows to the contrary, he made no claim to the company of any injury received in the accident of January 11—here sued on—until he filed this suit a day or two before it would have become barred by the statute of limitation, except the statement in his letter of January 20, that he was laid up 4 or 5 days following the accident when his condition had improved so much that he was able to resume work. In the meantime and without complaint of the injury here sued on, he had worked on at his job until he sustained the August accident, on account of which he was laid up 18 days; he put in a claim for the August accident and the company settled it. He resumed and continued in his employment until the following March, when the position he had occupied for 2 or 3 years was abolished, thus relieving him of steady employment. He was put on the extra board, remained there for some time, relinquished that final connection with appellant, took other employment and continued in it until January 9, 1926, 1 day short of 2 years, during all of which period he made no complaint or claim of injury as a result of the January 11, 1924, accident. Then, 1 day short of the bar of limitation, he filed suit for $40,000 damages, which he claims he sustained on account of injuries received 2 years before, and of which he had made no previous complaint. These peculiar circumstances are not controlling, of course, although it might well be urged that without explanation—as they are—they are apparently inconsistent with a claim of good faith. This apparent inconsistency is enhanced by a fair analysis of the evidence upon the issue of injury. As stated, appellee's claim of injury rests directly upon his testimony alone. Four doctors, including his own, examined him, and testified in the case. None of them, even after thorough examinations, aided by comprehensive blood and X-ray tests, could discover any evidence of physical injury or suffering. Three of them testified that he could not have suffered the pains and disorders of the character and duration testified to by him, without those pains and disorders

leaving some mark or sign in his body, whereas his examinations by them, with the aid of all the blood and X-ray tests apparently known to medical science, showed a total absence of evidence of the conditions of which he complained. One of these doctors testified:

"I do not believe it is possible for this man to have been suffering as he claimed without my being able to detect it by a physical or X-ray examination; it is my opinion that he would have to have some muscular atrophy and show physical weakness or wasting."

Appellee's own doctor, to whom he went shortly before filing this suit, testified to the absence of any physical evidence of the conditions, pains, and disorders of which appellee complained. It is true that this doctor testified in answer to a hypothetical question put to him by appellee's counsel, in connection with the history of the case given him by appellee at the time of the examination, that in his opinion appellee was suffering as he claimed, and that this condition could be attributed to the accident, but upon cross-examination this doctor further testified that in giving the witness the history of the case appellee described the accident of August, when he was thrown from the top of the box car to the ground, and not the accident of the previous January, upon which this suit is based. Of course, the probative value of this testimony of appellee's only supporting witness was destroyed when it was shown that his opinion was grounded upon a hypothesis based not upon the accident and injury upon which the suit is based, but upon a subsequent accident and injury. And the fact, which was not denied by appellee upon the stand, that in seeking the aid of this doctor as an expert for use in this suit appellee gave him the history of a subsequent accident and injury instead of that upon which the suit is based, throws an additional and grave suspicion upon the good faith of appellee's claim.

[2] We have gone into the evidence in tedious detail in deference to the wise restriction upon appellate courts in the exercise of the power to set aside findings and verdicts of juries. That power should never be exercised except in extreme cases, where the verdict is so contrary to the preponderance of the testimony, or is in such obvious conflict with the justice of the case, as to render it unconscionable. We have been unable to escape the firm conviction, however, that the record in this case presents such exception, and that it is the plain duty of this court to set aside the verdict and judgment appealed from.

Other questions are presented in the appeal, and in our opinion the matters complained of in appellant's twenty-fifth and twenty-sixth propositions show error which would require reversal or at least reformation of the judgment, but in view of the length of this opinion we pretermit a discussion of those matters, which will not likely arise upon another trial.

For the reason that the verdict was not warranted by the evidence, the court below should have granted appellant's motion for new trial, wherefore the judgment is reversed and the cause remanded for further disposition.