# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 5, 1999 Session

## WADE CUMMINS, ET AL. v. OPRYLAND PRODUCTIONS

### Direct Appeal from the Chancery Court for Davidson County
#### No. 96-3436-I        Irvin H. Kilcrease, Jr., Chancellor

---

### No. M1998-00934-COA-R3-CV - Filed March 7, 2001

---

This case involves the alleged breach of an oral contract and a claim of negligent misrepresentation. Defendant's agent contacted the plaintiffs, an Elvis impersonator, the members of his band, and members of the Jordanaires to book them for a performance nine months hence. Plaintiffs reserved the time, but no written agreement was ever executed. Weeks before the performance, Defendant informed Plaintiffs that their services would not be required. Plaintiffs sued alleging breach of an oral contract and negligent misrepresentation and now appeal the trial court's decision to grant summary judgment to Defendant on both issues. We affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Affirmed in Part and Reversed in Part

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J. joined.

Bryan E. Pieper, Nashville, Tennessee for the appellants, Wade Cummins, Gordon Stoker, Ray Walker, Neil Matthews, Duane West, Sandy Posey, Mary Fielder, Mike Schrimpf, Roger Bradley and Keith Ellis.

L. Webb Campbell, William L. Harbison, and J. Scott Hickman, Nashville, Tennessee, for appellee, Opryland Productions.

### OPINION

This case involves the alleged breach of an oral contract and a claim of negligent misrepresentation. The plaintiffs, Wade Cummins, an Elvis impersonator using the stage name Elvis Wade, the members of his band, and members of the Jordanaires (collectively "the Elvis act") appeal the trial court's decision to grant summary judgment to the defendant, Opryland Productions ("Opryland"). For the following reasons, we affirm in part and reverse in part.

In October 1995, Opryland's agent, Jan Thrasher, contacted Wade Cummins's agent, Barye Cassell, about booking the Elvis act for Atlanta's 1996 Summer Olympics. As a result of this and several other conversations, the Elvis act reserved the period between July 19, 1996 through August 4, 1996 for the Atlanta engagement. It is undisputed that all parties contemplated that the agreement to perform would be reduced to writing. However, no written contract was ever executed, despite the fact that Mr. Cassell sent one to Ms. Thrasher. In June of 1996, Ms. Thrasher informed Mr. Cassell that the venue had been leased to another entertainment corporation and the Elvis act's services would not be required.

After the Olympics concluded and the Elvis act received no compensation, it commenced this action, alleging breach of an oral agreement and negligent misrepresentation. The complaint stated that "the terms of the express oral contract were offered by Opryland Productions in October of 1995 and accepted by Wade Cummins in October of 1995." Finding that there was no meeting of the minds regarding the formation of an oral contract, the trial court granted Opryland's motion for summary judgment on the contract claim. The court declined to reach the negligent misrepresentation claim, reasoning that its finding that no contract was formed disposed of the issue. This appeal ensued.

## I.

Summary judgment is appropriate only if the moving party establishes that no genuine issues of material fact remain to be tried and, under the undisputed facts, judgment is required as a matter of law. Tenn. R. Civ. P. 56; *White v. Lawrence*, 975 S.W.2d 525, 528 (Tenn. 1998)(citing *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993)). Courts reviewing motions for summary judgment must consider the evidence in the light most favorable to the nonmovant, draw all reasonable inferences in favor of that party and discard all countervailing evidence. *White*, 975 S.W.2d at 529. The motion must be denied unless the only conclusion that can reasonably be drawn from the undisputed facts is that the movant is entitled to summary judgment as a matter of law. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Because it is solely a legal question, our determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied is *de novo*, and the trial court's determination does not enjoy a presumption of correctness. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn.1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn.1997).

## II.

The Elvis act argues that summary judgment was improperly granted on its contract claim. They maintain that whether there was a meeting of the minds on the essential terms of the contract was a disputed issue of material fact.

A contract may be expressed or implied, written or oral, but, to be enforceable, it must, among other elements, result from a mutual assent to its terms, be predicated upon sufficient consideration, and be sufficiently definite for its terms to be enforced. *Johnson v. Central Nat'l Ins.*

2

*Co.*, 210 Tenn. 24, 34-35, 356 S.W.2d 277, 281 (1962); *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). With respect to oral contracts, the court in *Jamestowne*, 807 S.W.2d at 564, also cited the Restatement Second of Contracts § 33 for the proposition that

> [e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain. The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. The fact that one or more terms of a proposed bargain are left open may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Further, the basic rules of contract formation in Tennessee are well established:

> An acceptance, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing, and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat, or it is a counter proposal, and in neither case is there an agreement. . . .

> In order that there may be a meeting of the minds which is essential to the formation of a contract, the acceptance of the offer must be substantially as made. There must be no variance between the acceptance and the offer. Accordingly a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested.

*Canton Cotton Mills v. Bowman Overall Co.,* 149 Tenn. 18, 31, 257 S.W. 398, 402 (1924) (citations omitted). Therefore, it is possible that parties can make an oral agreement to bind themselves to prepare and execute a final written contract, but the oral agreement must include all essential terms to be incorporated in the final document. *Engenius Entertainment, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997). Additionally,

> [t]hat document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain *any material term* that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Id.* at 17-18 (citations omitted).

Precedent requires us to use an objective test to determine mutual assent, rather than the outdated "meeting of the minds" theory. *Higgins v. Oil, Chem., & Atomic Workers Int'l Union*, 811

3

S.W.2d 875, 879 (Tenn. 1991). Even so, looking beyond the words themselves to assess the parties' subjective intent may be instructive. *See id.* As one federal court has observed in applying the objective standard:

> It is quite true that contracts depend upon the meaning which the law imputes to the utterances, not what the parties actually intended; but, in ascertaining what meaning to impute, the circumstances in which the words are used is always relevant, and usually indispensable. The standard is what a normally constituted person would have understood them to mean, when used in their actual setting.

*Id.* (quoting *New York Trust Co. v. Island Oil and Transp. Corp.,* 34 F.2d 655, 656 (2nd Cir. 1929)).

> However, it is also well established that

> [t]he contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer."

*Jamestowne on Signal, Inc.*, 807 S.W.2d at 564 (citations omitted).

Here, the trial court properly determined that there was no contract because there was no mutual assent as to the terms of the agreement and not all of the essential terms of the contract were included in the initial oral agreement. The record clearly shows that the negotiations were ongoing and never memorialized in a written contract as the parties undisputedly intended. Even after Mr. Cassell felt there was a binding oral agreement, he testified that he expected substantial changes in the terms of the written contract he submitted to Ms. Thrasher. In fact, he testified that should the artist not agree to the changes made by the buyer, there was no contract.

Viewing the evidence in the light most favorable to the Elvis act, as we must, it is undisputed that during the initial negotiations in October 1995, Ms. Thrasher informed Mr. Cassell that Opryland Productions intended to obtain talent for a production during the Olympics and resell it to another party in Atlanta. The performances were to be held at the Tabernacle, a venue adjoining one of the main Olympic staging areas. Ms. Thrasher expressed interest in the period between July 19 and August 4 and inquired about reserving several additional days in case she needed to book the Elvis act for a longer run.

Based on the initial conversations, on October 25, Mr. Cassell faxed Ms. Thrasher the following letter outlining and confirming his understanding of the agreement:

4

The purpose of this letter is to confirm our conversation this morning on Elvis Wade and the Jordanaires. We have put a hold on the days from July 19, 1996 through August 4, 1996. The venue would provide lights, sound, five single and five double hotel rooms. Additionally Elvis would have the right to sell concessions. We will be waiting to issue a contract upon the confirmation of Elvis Wade and the Jordanaires with your venue. I enjoyed meeting with you this morning. I feel our services and sources will allow us to work together as a team in the future on many projects. Please contact me as soon as you hear anything on the initial 18 days and the additional days.

According to Mr. Cassell, sometime between October 25 and November 6, 1996, Ms. Thrasher informed him the Elvis act had been approved by the venue in Atlanta and she wanted to book the act under the previously discussed terms. Mr. Cassell testified that Ms. Thrasher asked him to send her a contract.

Mr. Cassell sent a written contract to Ms. Thrasher in early November. However, the contract presented by Mr. Cassell to Ms. Thrasher included, in addition to the initial terms agreed on, provisions such as the contract was void if not signed within ten (10) days of issue, when payment was to be made (i.e., it required a 10% payment to be returned with the contract, 40% due by March 1, 1996, and 50% due at the conclusion of the performances), the cancellation penalties to be paid in the event the show was cancelled, the rights of the Elvis act to cancel prior to the event, complimentary tickets to be provided to the Elvis act, provisions regarding meals and transportation to be provided by Opryland, among other things. The contract was never executed by either representatives of Opryland nor the Elvis act.

The proposed written contract Mr. Cassell sent to Opryland also included the following additional provision:

ENTIRE AGREEMENT: The Modified Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and no modification or amendment of or supplement to the Modified Agreement shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced.

This language provides additional proof of the parties' intent not to be bound by the oral negotiations.

When asked why he sent the contract to Opryland for its signature before sending it to Mr. Cummins, Mr. Cassell testified, "[b]ecause it must go to the end user [the buyer of the act] to make sure the contract is a valid contract." He explained:

An artist never signs a contract until the buyer signs it because until you've signed it you haven't agreed to all of the stipulations that the artist may want on there, i.e.,

5

he had a rider that says I need so many lights, I need so many dressing rooms, and typically if you have a problem with that you will cross things out or make notation or changes to the contract. Then the contract will come back to me. I will take the contract, review it, and see what the changes are. Take it and pass the information on to the artist or send the contract to them. At that point in time they will decide if that's what they want to agree to. If not, I will go back and renegotiate with you as to what the differences may be. If everything is acceptable then he signs the agreement.

Further, at around the same time that Mr. Cassell sent the proposed contract for the Olympics engagement, he also issued contracts to Opryland for additional Elvis act performances in April and July of 1996. The contracts were submitted to Opryland's legal department which extensively revised them. Opryland omitted the language stating the contract became void after ten days if not signed and returned and changed some provisions relating to merchandising and percentages of merchandising in their favor. Opryland also struck a provision requiring prepayment of half of the Elvis act's fee. In February, Opryland signed and returned one of the contracts to Mr. Cassell. He sent it to Mr. Cummins who also executed it. Mr. Cassell explained that Opryland's legal department had a reputation for delay and its handling of these contracts led him to believe that the reason Opryland had not executed the Olympics contract was because the legal department was rewriting it.

During his deposition, Mr. Cummins explained his perception of how the contract formation procedure worked: once an artist has "confirmed the date to the buyer and once a date is confirmed and contracts have been issued it's a done deal . . . [e]ven though [the contracts] have not been signed . . . In the business if a buyer makes an offer and the act agrees to it, you have a deal. It's confirmed." Mr. Cummins agreed with the statement that "the only material terms with respect to that offer is [sic] the date to make sure that it's routable and to make sure that the artist is available and the amount of money." To the contrary, during his deposition, Mr. Cassell testified that there was more to a contract than date and price, like rooms, meals, sound, light, travel expenses, and the length of the show. He testified that these factors were material because the price was based on them.

According to the record, the performer's fee cannot be fairly evaluated without knowledge of the arrangements for rooms, meals, the number of people the performer must bring, the prices of and ability to sell souvenirs, travel time and expenses for the band. Thus, while the parties had orally reached a price for the performance, other factors had not been negotiated. What the price actually involved, in terms of profit, was not firmly established. The value of the fee, particularly with regard to the concessions, was still being negotiated when Mr. Cassell sent the proposed agreement to Opryland in early November. This conclusion is supported by Mr. Cassell's statement that after he sent the proposed contract to Opryland,

I had no question that I was not only going to get changes back but you [Opryland's legal department] probably would basically rewrite the whole contract . . .

6

Having reviewed the record, we find the Elvis act failed to establish that the terms of the agreement were sufficiently definite to be enforceable. *Castelli v. Lien*, 910 S.W.2d 420, 426-27 (Tenn. Ct. App. 1995). In a transaction so complicated, where the evidence shows that the parties did not even discuss many of the terms included on the numerous riders Mr. Cassell included with his contract, the record fails to show mutual assent sufficient to bind the parties.

Where the parties continue to negotiate regarding the material terms of a contract, there has been no mutual assent. *Peoples Bank v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). Proof of an ambiguous course of dealing between the parties from which differing inferences might be drawn regarding additions to or modifications of what was a limited and incomplete agreement is not sufficient to establish the required mutual assent. *Lay v. Fairfield Dev.,* 929 S.W.2d 352, 353-56 (Tenn. Ct. App. 1996); *Jamestowne on Signal, Inc.*, 807 S.W.2d at 564. Because the Elvis act cannot prove mutual assent, which is essential to the formation of a contract, summary judgment was proper on the contract claim.

III.

The Elvis act argues that the trial court erred in granting summary judgment on the negligent misrepresentation claim. It specifically disputes the trial court's conclusion that the existence of a contract is necessary as an element of negligent misrepresentation.

Tennessee law recognizes three distinct actions in tort based upon misrepresentation: (1) fraud or deceit; (2) misrepresentation under Section 402B of the Restatement (Second) of Torts (1965); and (3) negligent misrepresentation under Section 552 of the Restatement (Second) of Torts (1977). *See Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 130 (Tenn. 1995); *see also John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn. 1991). This case involves only the third cause of action, negligent misrepresentation.

Tennessee adopted Section 552 of the Restatement (Second) of Torts "as the guiding principle in negligent misrepresentation actions against other professionals and business persons." *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997); *Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592, 595 (Tenn. 1991). Section 552 provides in pertinent part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts, § 552 (1977).

Here, the trial court declined to reach the negligent misrepresentation issue because its "ruling that no contract was formed disposes of" that claim. Our Supreme Court has specifically addressed that issue:

In discussing the requirements for recovery under Section 552, this Court has stated that liability in tort will result, despite the lack of contractual privity between the plaintiff and defendant, when,

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

(2) the defendant supplies faulty information meant to guide others in their business transactions; and

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

(4) the plaintiff justifiably relies upon the information.

*Robinson*, 952 S.W.2d at 427 (quoting *John Martin Co.*, 819 S.W.2d at 431).

In cases involving commercial transactions, the absence of privity of contract has not prevented our courts from granting relief for negligent misrepresentation. *Robinson*, 952 S.W.2d at 428 (relying on *Shelby v. Delta Air Lines, Inc.*, 842 F. Supp. 999, 1015 (M.D. Tenn. 1993)). For example, our Supreme Court has allowed non-clients to recover from attorneys. *See e.g. Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988); *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987) (non-client participants to real estate transactions recovered after justifiably relying on erroneous information negligently provided by the lawyers). Likewise, a manufacturer recovered against a national accounting firm where the manufacturer extended credit to a customer in justifiable reliance on an audit report regarding the customer negligently prepared by the accounting firm. *Bethlehem Steel Corp.*, 822 S.W.2d at 592. In *John Martin Co.*, 819 S.W.2d at 429, a construction manager who negligently supplied information regarding the construction project was held liable to a subcontractor who relied upon the information in performing work at the site. This court also permitted recovery

8

by sellers of property against a land surveyor who negligently prepared a plat for the purchasers because he had full knowledge that the survey was to be used for describing the property in the warranty deed upon which both the sellers and buyers would rely. *Tartera v. Palumbo*, 224 Tenn. 262, 453 S.W.2d 780 (Tenn. 1970). Thus, the lack of a binding contract will not defeat the Elvis act's claim.

It is undisputed that Ms. Thrasher was acting in the course of her employment and in a transaction on behalf of her employer who had a pecuniary interest in the transaction. Whether she supplied faulty information is disputed. The Elvis act asserts that Ms. Thrasher told Mr. Cassell and Gordon Stoker, the Jordanaires' agent, that the Atlanta arrangements were firm. Mr. Cassell testified that Ms. Thrasher repeatedly assured him that Opryland "was the guarantor of the date, [and] the date was good." He reiterated:

> Ms. Thrasher told me from – like I said, from January on, 'We're the guarantor of the dates. We're guaranteeing the dates. The dates are good. We're the ones that are responsible.' So I had no reason to doubt that Opryland was not of the feeling – because I don't think, unless Mr. Gaylord has changed his operating procedures, that he would put money out for something just to be throwing money out; that he would see money coming in. So, it was my impression that whatever they were doing with that event down there, that was on their end of the working deal and they were working with that individual to make sure they were going to be paid thereafter so that they could pay on this side. And I was not told until around the first of June that the date was off; that they didn't have the venue. That was the first time I had heard the whole thing was dead, gone, over. It was not going to happen.

Mr. Stoker testified that Ms. Thrasher informed him that the people in Atlanta had sent Opryland a partial payment before the dates. He stated, "Jan always, always assured me this is a good deal, that she was excited about it and, you know, everything was a sure thing." He testified that he talked with Ms. Thrasher "at least four or five times" between October 1995 and the point when she told him the deal was off and "every time I talked with her she was always excited about it, always said everything was on go, everything looked good . . . every time I talked to her she always assured me everything to be, you know, as it should be . . . She always assured me, 'Gordon, don't you worry. We're going to take care of you. You're going to get paid. No problem at all. Don't you worry about it.' She said, 'We stand behind' – the exact words she told me, more than once, 'We stand behind our deal.'" The fact that Mr. Stoker had known Ms. Thrasher for some time because she and Mr. Stoker's sons had worked together and were "very close friends" gave her additional credibility in his eyes.

In her affidavit, Ms. Thrasher stated that she advised Mr. Cassell that the Atlanta venue had not been secured in December 1995, soon after she received that information. She claimed that "[w]hen the venue had not been secured by March 1996, I told Mr. Cassell that his artists should not hold the July 1996 dates unless they were willing to risk losing them if the venue was not ultimately secured." She denied telling Mr. Cassell, Mr. Cummins, or Mr. Stoker that the dates were

guaranteed.

Opryland argues that the information at issue cannot provide a basis for negligent misrepresentation because it does not consist of statements of a material past or present fact. Instead, it contends the information at issue are merely statements about a future intent to perform.

Without question, Tennessee courts require that the false information consist of statements of a material past or present fact. *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). "[T]he tort of negligent misrepresentation cannot be based on conjecture, statements of opinion, puffing and sales talk, or representations of future events." *Glanton v. Beckley*, No. 01A01-9606-CV-00283, 1996 WL 709373 at * 9 (Tenn. Ct. App. Dec. 11, 1996) (Koch, J., concurring) (no Tenn. R. App. P. 11 application filed).

In *Glanton*, this court determined that an investor could recover from a property owner who assured her that $1,600 per month in rental fees would be available to cover renovation and maintenance costs. *See id.* at * 6. In analyzing this result, the concurrence discussed the requirement that the information at issue be limited to past and present facts. It explained that the investor's success hinged on her testimony that the property owner told her that he expected that their monthly rental income after renovating the house would be $1,600 because he and three of his associates had agreed to lease the space for $400 per month each. *See id.* at * 9.

> While the statements concerning the anticipated rental income involved future events, they were based on the present fact that Mr. Glanton and his three associates had already agreed to lease offices in the building once it was renovated. The representations concerning these existing agreements involve a present or past fact and, therefore, support a claim for negligent misrepresentation.

*Id.*

This same reasoning applies here. Mr. Stoker testified that while assuring him of the viability of their agreement, Ms. Thrasher stated that the people in Atlanta confirmed the deal by sending Opryland a partial payment before the dates. While the alleged statements concerning the anticipated guarantee of payment and the viability of the deal involved future events, they were based at least in part on the alleged present fact that the people in Atlanta had already committed funds to the project. The representations concerning the partial payment involve a present or past fact and, therefore, are sufficient to support a claim for negligent misrepresentation.[1]

---

[1]We are unpersuaded by the Elvis act's contention that Ms. Thrasher's silence about securing the venue constitutes additional proof of negligent misrepresentation. Non disclosure can provide a basis for misrepresentation only where there is a duty to disclose. *See Axline v. Kutner*, 863 S.W.2d 421, 423 (Tenn. Ct. App. 1993). The Elvis act has pointed to no authority imposing such a duty in this case.

The Elvis act contends that if, as she attested, Ms. Thrasher knew that the arrangements for the venue were not finalized, her continued assurances that the contract was binding and the date was good were actionable. Whether Ms. Thrasher exercised reasonable care in obtaining or communicating that Opryland would honor their agreement remains a disputed fact precluding summary judgment.

Opryland argues that the Elvis act cannot establish the element of justifiable reliance because the Elvis act never relied on the status of the Atlanta deal. For this proposition, they rely on Mr. Cassell's testimony that he believed Opryland was going to buy the talent and resell it to parties in Atlanta. We cannot agree that Mr. Cassell's testimony necessarily precludes a finding of reasonable reliance, in light of the testimony regarding Ms. Thrasher's assurances and the evidence that the Elvis act turned down offers for other bookings during the time period at issue.

Opryland further argues that the Elvis act's reliance was not reasonable because no contract was ever executed. This Court has previously recognized that the reasonableness of a plaintiff's reliance on an alleged misrepresentation is generally a question of fact inappropriate for summary judgment. *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996). In light of Ms. Thrasher's alleged assurances and Opryland's exclusive control of information about the viability of the Atlanta engagement, we believe the issue of the reasonableness of the Elvis act's reliance cannot be determined as a matter of law. *City State Bank*, 948 S.W.2d at 737.

Accordingly, the order granting summary judgment to Opryland is affirmed in part as to the contract claim and reversed in part as to the negligent misrepresentation claim. Costs of this appeal are to be divided equally between the parties. The case is remanded to the trial court for further proceedings consistent with this opinion.

_____
PATRICIA J. COTTRELL, JUDGE

11