JAMESTOWNE ON SIGNAL, INC.,
Fred M. Edgemon, Jr., and James
R. Hedges, III, Plaintiffs–Appellees,

v.

FIRST FEDERAL SAVINGS & LOAN
ASSOCIATION, Defendant–Appellant.

Court of Appeals of Tennessee,
Eastern Section.

Nov. 14, 1990.

Permission to Appeal Denied by
Supreme Court March 11, 1991.

Joe A. Conner with Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, and Raymond R. Murphy, Jr. with Miller & Martin, Chattanooga, for defendant-appellant.

Michael E. Richardson with Patrick, Beard & Richardson, Chattanooga, for plaintiffs-appellees.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

The pivotal issue on this appeal is whether or not the Defendant–Appellant, First Federal Savings & Loan Association, breached an alleged oral contract to finance the total cost of construction of a condominium complex on Signal Mountain.

In September, 1985, the Plaintiffs–Appellees, Jamestowne on Signal, Inc. (Jamestowne), Fred M. Edgemon, Jr. (Edgemon), and James R. Hedges, III (Hedges), filed an application with Defendant–Appellant First Federal Savings & Loan Association (First Federal) for a construction loan on a 25–unit condominium complex on Signal Mountain. Jamestowne is a corporation and the property upon which the complex was to be constructed was titled in it. Edgemon and Hedges are the owners of all the capital stock of Jamestowne. The prospectus of the complex, submitted with the

loan application, showed an estimated cost of construction of $2,371,225, gross sales of units $3,335,000, cost of marketing $200,106, with a net profit of $763,739. Construction was to be completed in four phases, mostly of six units each and all units were to be completed within 18 months.

First Federal issued a commitment letter agreeing to loan $2,040,000 for a term of 18 months with interest at 11% payable semiannually. The commitment was subject to the following: "1. A detailed architectural inspection report to be provided before each payout request; 2. Release amounts shall be 80% of retail prices, regardless of actual sales price; and 3. First Federal must give approval of phases II, III, and IV, before they are begun."

The loan commitment was accepted and a note secured by a deed of trust was executed on November 5, 1985, in keeping with the commitment. Edgemon and Hedges each personally endorsed the note. Simultaneously with the note and deed of trust a construction loan agreement was executed which, as pertinent here, provided: "Inspections will be made prior to any disbursements of funds by Lender in accordance with its customary inspection sheet, and Lender is under no obligation to disburse a greater portion of the loan proceeds than the percentage of completion indicated by its inspection. If the amount approved by Lender is insufficient to pay all amounts owing for labor and materials, Borrower agrees to furnish sufficient funds to make up the difference. Lender in no way guarantees Borrower that the amount loaned will be sufficient to complete construction. Lender may in its sole discretion disburse amounts in excess of the percentage indicated by its inspection but has no obligation to do so."

Soon after the execution of the deed of trust and note, construction began on six units under phase one of the project. As construction progressed, requests for draws were submitted. As these requests were submitted, it was the duty of Mr. Davis, an appraiser for First Federal, to make an inspection of the construction completed and authorize payment of such amount as the percentage of construction relating to the total construction of the project (that is, all four phases of the complex) related to the total loan of $2,040,000. However, in April, 1986, it was discovered Mr. Davis was relating the percentage of construction of phase one of the complex to the total amount of the loan, which had resulted in his approving substantially larger amounts for draws than were authorized. At that time First Federal had over disbursed to the borrowers approximately $98,000. After discovering this overpayment Mr. Campbell, one of the loan officers, contacted Messrs. Edgemon and Hedges to discuss the matter. They stated they had had a lot of cost overruns on their sewers, extra fill dirt, underground rock removal, extra masonry fence, etc., and needed the extra money. At that time the borrowers had commitments to purchase five of the six units under construction. It was agreed the total purchase price of these houses would go to First Federal to reduce the overpayments which had occurred and would continue to accrue until the houses were sold. Based upon this agreement, First Federal continued to make overpayments through August and it built up to a total of $239,000. One of the houses sold on July 31 and four of them sold in September, which reduced the over-disbursement to about $37,000.

In September and October the borrowers submitted draws for more than the percentage of work that had been completed. First Federal, however, approved these draws based upon the representations of the borrowers that they had a lot of people interested in purchasing houses.

In the latter part of October Messrs. Edgemon and Hedges mentioned to some of the First Federal officers that they were going to require additional financing. They were requested to submit a recap on what was needed. On November 7, 1986, they submitted a recap of construction cost showing an estimated cost for completion of the project of $1,060,000. By that time approximately 75% of the construction loan had been disbursed, the project was approximately 51% to 52% complete, and there was only $526,000 of undisbursed

loan funds left in the loan fund account. Also, on October 20, 1986, Libby Shorbe, loan closing officer for First Federal, had written to Edgmon and Hedges reminding them that accrued interest on the loan in the amount of $47,828.78 would be due on November 1, but this was not paid.

On or about November 20 a draw request for $121,025 was submitted. After an inspection of the percentage of construction completed, First Federal approved $32,000 of the request but advised Edgemon and Hedges they would need to furnish more collateral before the balance could be disbursed. Edgemon and Hedges refused to furnish additional collateral. They also failed "to furnish sufficient funds to make up the difference," as required by the construction loan agreement. Instead, they ceased all construction on the project.

On December 9, 1986, Plaintiffs sent First Federal a request for an additional $900,000 funding for the project. They offered specific additional collateral for the loan and asked for an extension of the due date of the original loan to April 30, 1988. After considerable negotiation, a modified agreement was reached whereby the Plaintiffs would execute a note for $250,000 and pledge an additional $250,000 collateral. Then the $526,000 balance of the original loan would be disbursed as follows: Past-due interest, $50,000; payment of outstanding bills, $120,000; cost of completion of four units, completion of the exterior of five units, development site and pool construction, $360,000. First Federal would finance each unfinished unit as it was sold.

The project proceeded under this arrangement until September 22, 1987, when the Plaintiffs submitted a proposal to First Federal to loan them an additional $881,000 which was needed to complete the entire project. In this proposal it was estimated that completing all of the units and selling them would bring enough to pay off the loan. This would make First Federal come out even. First Federal agreed to make the additional loan and a new deed of trust and note were entered into on October 1, 1987, which would mature May 1, 1988.

Construction proceeded until April, 1988, when Appellants requested an additional $240,000 to complete the project. First Federal refused because there was no security for the additional loan. At that point First Federal had disbursed to the borrowers on draw request the sum of $3,133,407.17. There were four units which were unfinished and five others which had not been sold, but First Federal had disbursed all the funds secured by both the original and second deeds of trust.

The note matured on May 1, 1988, but First Federal did not foreclose immediately. It delayed to give the borrowers an opportunity to work something out if possible, but they were unable to work out a solution to the problem. They then went to First Federal and demanded it pay them $700,000, pay all of their outstanding bills, release all their additional collateral, and release them from their liability on the notes. In exchange they would deed Jamestowne to First Federal. This was declined by First Federal.

After foreclosure of the property there remained a deficiency of $324,076.67 which Plaintiffs refused to pay. Instead, they filed their complaint against the Defendant, alleging their failure to complete the project and the resulting financial losses were the result of First Federal's breaking an oral contract to totally finance the construction cost of the project. In their complaint, Plaintiffs alleged "First Federal represented ... it would finance the project, in its totality, without any capital or collateral investments by Plaintiffs." They alleged the amount of the construction loan was $2,040,000 and Jamestowne executed a deed of trust and note to secure the loan, with Edgemon and Hedges as endorsers. "These loan documents did not contain any provision allowing First Federal to change or alter the terms of the financing or demand additional collateral, but it was contemplated at such time and later that First Federal would, if necessary, advance additional funds for completion of the project." They alleged that "by course of dealing, First Federal assumed a fiduciary duty to the plaintiffs" and "became a *de facto* partner" in the project. They alleged First

Federal's refusal to fund the $121,025 draw in November, 1986, and its demand for additional collateral "constituted bad faith, breach of contract, breach of fiduciary duty, fraud and misrepresentation, economic duress and business coercion." They alleged the January 9, 1987, "modification agreement was executed by them under economic duress and business coercion." They alleged First Federal was guilty of bad faith, fraud and misrepresentations in requiring them to endorse the note and pledge the collateral. They alleged that, as a result of First Federal's breach of contract, bad faith, fraud and misrepresentations, they have suffered damages. They sought damages in excess of $1,000,000 and punitive damages.

First Federal, for answer, joined issue on all allegations. It denied the existence of any oral agreement to fund the total cost of constructing the project or any other oral contract to finance any part of the project. It alleged any claimed oral agreements were void and unenforceable for failure to comply with the statute of frauds, T.C.A. § 29–2–101, and in violation of the parol evidence rule, and any loss suffered by the Plaintiffs was the result of their own mismanagement.

By way of cross-complaint, First Federal alleged Jamestowne executed three promissory notes secured by collateral and endorsed by Edgemon and Hedges as guarantors. Default occurred on each of the notes. The collateral was foreclosed on and, after giving full credit for all payments received from collateral, there remained a deficiency, as of February 13, 1989, of $419,308.69 plus attorneys' fees, for which it demanded judgment.

Upon the trial of the case, the controlling issue was whether or not First Federal had breached a contract with the Plaintiffs that it "would finance the project, in its totality, without any capital or collateral investment [other than the original deed of trust and note] by Plaintiffs." The case was tried before a jury and the transcript of testimony is rather voluminous. However, the only major issue on which there is a material dispute is whether or not such a contract

was, in fact, in existence. Mr. Edgemon and Mr. Hedges testified for the Plaintiffs that such a contract existed. Mr. Campbell and Mr. Guerry, testifying for the Defendant, said no such contract was made. In analyzing the proof in the record on this issue, the Appellees, in their brief, aptly stated it as follows: "In reality, this particular issue boiled down to a swearing contest between Jim Hedges and Fred Edgemon on the one hand, and Rusty Campbell and John Guerry on the other."

The testimony of both Mr. Edgemon and Mr. Hedges indicates Mr. Rusty Campbell, who was the loan officer for First Federal in charge of servicing their loan, agreed, or at least led them to believe from the very inception of the original construction loan of November 5, 1985, that First Federal would loan all additional money which might be necessary to complete the project and such additional money would be forthcoming without any additional collateral or obligation on them individually. This conclusion was reached because soon after the construction loan was closed Mr. Edgemon and Mr. Hedges decided to upgrade the quality of construction of the entire complex. They also decided to increase the square footage in a number of the units. As a result of these changes, they realized the project was going to cost substantially more than the original estimate of $2,371,-000. They concluded, however, they would recoup the additional cost by increasing the sales prices of the individual units. They testified they shared this information with Mr. Campbell and he agreed with them that this was a good thing to do. Mr. Edgemon testified he and Mr. Hedges knew as early as January or February, 1986, that the project was going to cost $700,000 to $900,-000 more than the original estimate and Mr. Campbell had agreed First Federal would let them have the money. Messrs. Edgemon's and Hedges's testimony is also to the effect that during the latter part of October, 1986, when they were having an open house to display a model of a completed unit, Mr. Guerry, who was president and chief executive officer of First Federal, was present. On this occasion he led them to believe First Federal would loan such

additional funds as would be necessary for the completion of the project. Mr. Edgemon's testimony was to the effect that on this occasion Mr. Guerry had been shown through the project and told of their plans for the development and "Mr. Guerry, he said that it sounded reasonable, thought that'd be pretty good, he said, 'But I'll have to obviously go back, talk to the board, clear that with First Federal.'" He further testified Mr. Guerry asked them to submit a recap of what had been done. That recap was submitted in November and showed it would take an additional $900,-000 to complete the project.

Mr. Hedges described Mr. Guerry's statement about the project as follows: "We took them throughout the project. They were extremely bullish. They said they were pleased with what we were doing, and Mr. John Guerry stated to me, he said, build the project out period. He concurred with all of our conclusions and with what we had been explaining to Rusty Campbell since day one of the loan." He testified that on this occasion Mr. Campbell asked them to prepare a budget and recap on what they were doing "because they [First Federal] were agreeing, they were preparing apparently to agree in writing to spend a lot of additional money to upgrade the project according to our proposal." He further testified the recap which was prepared in response to this request was the first written estimate of additional funds needed to complete the project which had been furnished to First Federal since the original construction loan application.

At the conclusion of the Plaintiffs' proof the Defendant moved for a directed verdict. Its motion was predicated on two theories. One, that the Plaintiffs admitted executing the notes and that they were in default; they had not challenged the foreclosure as being improper and the amount of deficiency was not in dispute and judgment should be entered on behalf of First Federal for the amount of the deficiency plus attorneys' fees. The second theory was that the necessary elements of an oral contract between the Plaintiffs and First Federal had not been proved and Plaintiffs' complaint

should be dismissed. The motion was overruled.

The Defendant offered proof establishing the transactions between it and the Plaintiffs as heretofore stated in this opinion. It also called as a witness Mr. Rusty Campbell, the First Federal loan officer who initially had charge of Plaintiffs' loan file. As pertinent here, he testified neither he nor anyone else he knew of ever agreed for First Federal to increase the amount of the $2,040,000 loan prior to December, 1986.

Mr. John Guerry, president and chief executive officer of First Federal, testified, as pertinant here, he never, at any time after the original construction loan was made, prior to December, 1986, agreed to First Federal's lending any additional money on the project. He also denied telling either Mr. Edgemon or Mr. Hedges in October to finish the project or "build it out." On cross examination he was asked, and testified as follows:

"Q. Now, you were asked about whether you had any discussions with these gentlemen about First Federal committing to fund out the completion of the project. You basically said you could not have done that because anything would have been subject to the loan committee approval?

"A. Yes, sir. I said I did not say that, and I would not or could not because in a financial institution, be it First Federal or the American, you have many documents, many procedures, and that's what you go by." He further testified as follows concerning the procedure for Mr. Campbell in handling a loan application:

"Q. And Mr. Campbell had the authority to deal with that loan and administer it?

"A. Yes. There again, Mr. Campbell would take the loan application, he would, after talking to the senior vice president loans, if it looked good, would present it to the management loan committee, and it would go from there to the directors loan committee, and if approved, the letter of commitment would be written, and if disapproved the person, the borrower would be notified."

At the conclusion of all the proof, Defendant renewed its motion for a directed verdict, which was overruled.

The jury found the issues in favor of the Plaintiffs and returned a verdict for $180,-000. Defendant's motion for a judgment notwithstanding the verdict, or for a new trial, was overruled and it has appealed, presenting a number of issues for review.

The Appellant's first two issues are: 1. "The failure of the Court to rule for First Federal on its motions for directed verdict," and 2. "The failure of the Court to find that the terms of the alleged modified contract were too indefinite to be enforced as a matter of law." We find these issues to be controlling and the other issues are pretermitted.

■ On a motion for a directed verdict, the trial judge and appellate courts must take the strongest legitimate view of the evidence in favor of the plaintiff, allow all reasonable inferences to be drawn from the evidence and discard all countervailing evidence. The motion should be denied if there is any doubt as to the conclusions to be drawn from the evidence as a whole. If reasonable minds could draw only one conclusion from the evidence, the verdict should be directed. *See Sauls v. Evans*, 635 S.W.2d 377 (Tenn.1982). Only if there is no material evidence in the record which would support a verdict for the plaintiff under any of his theories which he has advanced, may the trial judge's action in directing a verdict be sustained. *See Wharton Transport Corp. v. Bridges*, 606 S.W.2d 521 (Tenn.1980).

■ Under this rule it must be found the jury believed the testimony of Mr. Edgemon and Mr. Hedges over that of Mr. Campbell and Mr. Guerry. Also, if there was, in fact, a new contract made between the Plaintiffs and First Federal, there is no question but what it was breached in that First Federal required Mr. Edgemon and Mr. Hedges to pledge an additional $250,-000 in collateral and also declined to fund the last request of the Plaintiffs for an additional $240,000. We find, however, that the proof of the Plaintiffs, even though accepted as true, is too indefinite to

create an enforceable contract as a matter of law. It is well established in this jurisdiction that a contract can be expressed, implied, written, or oral, but an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced. *Johnson v. Central National Ins. Co. of Omaha, Neb.*, 356 S.W.2d 277, 281 (Tenn. 1961); *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924 (Tenn.App.1984). The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. *Batson v. Pleasant View Utility Dist.*, 592 S.W.2d 578, 582 (Tenn.App.1979); *Balderacchi v. Ruth*, 256 S.W.2d 390, 36 Tenn. App. 421 (1953). In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer." *Talley v. Curtis*, 129 S.W.2d 1099, 23 Tenn.App. 181 (1939).

> Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement, Contracts 2d § 33.

■ The problem with the agreement between Plaintiffs and First Federal stems not from what was agreed upon but from the lack of showing of any agreement which contains the essential ingredients to form an enforceable contract. The agreement was intended to cover the loaning of a substantial amount of additional money. However, there is no showing of any of the essential elements of such a loan, such as

the amount to be loaned, the duration of the loan, how it was to be repaid, the rate of interest to be paid and when, what security, if any, was to be given.

We have been cited to no reported cases in this jurisdiction specifically addressing this issue, but in other jurisdictions it is uniformly held that for an agreement to loan money to be enforceable it must contain such essential elements as the amount of money to be loaned, the duration of the loan, the rate of interest, the method of payment, and collateral securing the loan. In the case of *Union State Bank v. Woell, et al.*, 434 N.W.2d 712 (N.D.1989) the bank brought suit on two past-due notes. The borrower counterclaimed, seeking damages from the bank under various theories of liability. The Supreme Court of North Dakota, in addressing the issues of the sufficiency of an oral contract, said:

Woell asserts that he and the Bank entered into an oral agreement that required the Bank "to continue loaning money to Woell up to the extent of the Bank's lending limit and then to put Woell into contact with other lending sources beyond this Bank's lending limit." The trial court correctly concluded that no enforceable agreement existed as a matter of law.

In *Lohse v. Atlantic Richfield Co.*, 389 N.W.2d 352, 355 (N.D.1986), we said: "To be valid and enforceable, ... a contract must be reasonably definite and certain in its terms so that a court may require it to be performed. *Morey v. Hoffman*, 12 Ill.2d 125, 145 N.E.2d 644 (1957). It must spell out the obligations of each of the parties with reasonable definiteness. Indefiniteness as to any essential element of the agreement may prevent the creation of an enforceable contract. *Hansen v. Snell*, 11 Utah 2d 64, 354 P.2d 1070 (1960). Thus contracts must be definite enough to enable a court to ascertain just what is required of the respective parties in the performance thereof. Courts will not uphold agreements which are indefinite and uncertain as to the obligations imposed upon the parties thereto. *Richards v. Oliver*, 162 Cal.App.2d 548, 328 P.2d 544

(1958)." [Quoting *Mag Construction Company v. McLean County*, 181 N.W.2d 718, 721 (N.D.1970).]

Essential terms of an oral contract to continue lending money in the future include the amount and duration of the loans, interest rates, and, where appropriate, the methods of repayment and collateral for the loans, if any. *See Hunt v. McIlroy Bank and Trust*, 2 Ark.App. 87, 616 S.W.2d 759, 762 (1981); *Stansel v. American Sec. Bank*, 547 A.2d 990, 993 (D.C.Ct.App.1988); *McClellan v. Banc Midwest, McLean County*, 164 Ill.App.3d 304, 115 Ill.Dec. 351, 354, 517 N.E.2d 762, 765 (1987); *Labor Discount Center, Inc. v. State Bank & Trust Co.*, 526 S.W.2d 407, 425 (Mo.Ct. App.1975); *Malaker Corp., Etc. v. First Jersey Nat'l Bank*, 163 N.J.Super. 463, 395 A.2d 222, 228 (1978). *In re Destron, Inc.*, 59 B.R. 240, 244 (N.D.Ill.1986). Taken alone, the absence of any one of these terms may not be of great significance; however, viewed collectively, their absence is fatal to the existence of a binding contract. *Labor Discount Center v. State Bank & Trust Co., supra; see also* Restatement (Second) of Contracts § 33, comment b. illustration 2 (1981).

Id. p. 717.

In the case of *The Delcon Group, Inc., et al. v. Northern Trust Corporation, et al.*, 187 Ill.App.3d 635, 135 Ill.Dec. 212, 543 N.E.2d 595 (1989) borrowers brought suit against bank for breach of an oral contract to loan money and increase a line of credit. The Second District of the Appellate Court of Illinois, in reversing a jury verdict for the borrowers, said:

An agreement to continue to refinance or roll over a debt appears similar to an oral contract to lend money in the future. A valid cause of action for breach of an oral contract to lend money in the future is recognized in Illinois. (*Wait v. Midwest Bank/Danville*, (1986), 142 Ill. App.3d 703, 707, 96 Ill.Dec. 516, 521, 491 N.E.2d 795, 800; *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill.App.3d 822, 67 Ill.Dec. 421, 444 N.E.2d 657.)

The party claiming such a contract must show that the alleged agreement contains sufficient definitiveness to be enforceable. (*Wait,* 142 Ill.App.3d at 708, 96 Ill.Dec. at 522, 491 N.E.2d at 801; *Carrico v. Delp,* (1986), 141 Ill.App.3d 684, 688, 95 Ill.Dec. 880, 883, 490 N.E.2d 972, 975.) In *Wait* and *Carrico* our court cited *McErlean v. Union National Bank* (1980), 90 Ill.App.3d 1141, 46 Ill. Dec. 406, 414 N.E.2d 128, where it was held an agreement to loan money in the future was enforceable only if it contemplated the terms upon which the future loan should be made. The *McErlean* court stated: "These terms would include, for example, the intended duration of the line of credit; the applicable rate of interest to be charged for any loan emanating from such an agreement, or the basis for how such interest would be ascertained; what duration or date or dates were contemplated for maturity of such loans; and what mode or rate of repayment was contemplated, i.e., whether the entire amount would be repayable or if repayment in installments would be acceptable." 90 Ill.App.3d at 1146, 46 Ill.Dec. at 410, 414 N.E.2d at 132. (*Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill.App.3d 1090, 1093–94, 116 Ill.Dec. 742, 744–45, 519 N.E.2d 957, 959–60.)

Moreover, one of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking. *Allen v. Amber Manor Apartments Partnership* (1981), 95 Ill. App.3d 541, 549, 51 Ill.Dec. 26, 32, 420 N.E.2d 440, 446.

Id. 135 Ill.Dec. p. 217, 543 N.E.2d p. 600.

In the case of *Stansel and Burleson v. American Security Bank,* 547 A.2d 990 (D.C.App.1988) the bank sued the borrowers on a promissory note. The borrowers counterclaimed, alleging the bank breached an enforceable oral agreement to provide additional loans for the renovation of property. The District of Columbia Court of Appeals, in affirming the dismissal of the counterclaim, said:

Stansel and Burleson failed to adduce evidence sufficient to show that a separate oral agreement existed committing the Bank to provide funding for Stansel's renovation and permanent financing. They presented no proof that the Bank went beyond mere preliminary discussions and actually offered such funding. *See* Restatement (Second) of Contracts § 26 (1981). Neither defendant offered evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance. Thus their claim of breach of contract fails for lack of certainty of the contract's terms. *See Craig v. Acacia Mutual Life Insurance Co.,* 88 A.2d 184, 185 (D.C.1952); *Maurice Electrical Supply Co. v. Anderson Safeway Guard Rail Corp.,* 632 F.Supp. 1082, 1087 (D.D. C.1986); Restatement, supra, § 33.

Id. p. 993. *Also see Hunt, et al. v. McIlroy Bank and Trust,* 2 Ark.App. 87, 616 S.W.2d 759 (1981); *Okun v. Morton, et al.,* 250 Cal.Rptr. 220, 203 Cal.App.3d 805 (1988) and *Kruse v. Bank of America,* 248 Cal.Rptr. 217, 202 Cal.App.3d 38 (1988).

Based on the authority cited above, we find the oral agreement between the Plaintiffs and First Federal failed to contain the necessary elements to make it an enforceable contract and the trial court was in error in denying Defendant's motion for a directed verdict. The judgment of the trial court is reversed and Plaintiffs' complaint is dismissed. The case is remanded to the trial court for the entry of a judgment in keeping with this opinion and fixing the amount Defendant is entitled to recover under its counterclaim. The cost of this appeal, together with the cost in the trial court, is taxed to the Appellants.

FRANKS, J., and INMAN, Special Judge, concur.