IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2024 Session

## LEONARD GAMBLE v. ERIC BRIAN FRIEND

**Appeal from the Circuit Court for Davidson County**
**No. 21C2250  C. David Briley, Judge**

_____

**No. M2023-01452-COA-R3-CV**

_____

A property owner granted a friend permission to live on his property while the friend was renovating the owner's house. Five years later, the owner filed a successful detainer action against the friend in general sessions court. The friend appealed the adverse judgment to circuit court and, in that forum, filed a counterclaim asserting multiple causes of action including breach of contract and quantum meruit. After a bench trial, the trial court granted the property owner a detainer and dismissed the friend's counterclaims. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and JEFFREY USMAN, JJ., joined.

G. Kline Preston, IV, Nashville, Tennessee, for the appellant, Eric Brian Friend.

Katelynn King, Trent North Notestine, and R. Elliott Graves, Nashville, Tennessee, for the appellee, Leonard Gamble.

### MEMORANDUM OPINION[1]

#### I.

#### A.

In 2015, Leonard Gamble purchased a 26.5-acre tract on Springfield Highway in Goodlettsville, Tennessee. Mr. Gamble wanted to live on the property, which contained a

_____

[1] Under the rules of this Court, as a memorandum opinion, this opinion may not be published, "cited[,] or relied on for any reason in any unrelated case." TENN. CT. APP. R. 10.

dilapidated 1920s-era home with little or no monetary value. He turned to Eric Brian Friend, a friend in the construction business, for advice. Mr. Friend estimated that he could renovate the existing home in about six months.

The two men agreed that Mr. Friend would oversee the renovations and Mr. Gamble would provide the funding. Mr. Gamble promised to convey five acres of his property to Mr. Friend upon completion of the work. The men never memorialized their oral agreement in writing.

Mr. Gamble opened a construction account and gave Mr. Friend a debit card to use for materials and living expenses. According to Mr. Gamble, he agreed to deposit a maximum of $30,000 into the account in $1,000 weekly increments for six months. For his part, Mr. Friend denied ever discussing a monetary cap. And he insisted that Mr. Gamble agreed to pay him $1,000 a week for living expenses **plus** the cost of any materials. As for the six-month deadline, Mr. Friend claimed that three months into the project, he told Mr. Gamble "there was no way" that he could complete the renovations in that time frame.

Mr. Friend's timing prediction proved accurate. At six months, the renovations were nowhere near completion. Yet Mr. Gamble continued to make semi-regular deposits into the construction account when funds were available so "that we could get this thing done." He ultimately deposited a grand total of $157,000 into the account.

Eight or nine months into the project, Mr. Gamble gave his friend permission to move onto the property. And he allowed Mr. Friend to convert an outdoor pavilion on the property into an efficiency apartment for his temporary residence. Mr. Gamble never asked or expected Mr. Friend to pay for rent or utilities. They did not sign a written lease. Mr. Gamble asserted that he made these concessions because his friend "didn't have anywhere else to go." It was not in exchange for Mr. Friend's labor.

Over five years later, the renovation was still incomplete. Tired of the delay and out of funds, Mr. Gamble sent Mr. Friend a series of eviction notices. The notices directed Mr. Friend to stop work and vacate the premises. When Mr. Friend failed to comply, Mr. Gamble filed a detainer action against Mr. Friend in general sessions court and won. Mr. Friend appealed the adverse judgment to circuit court. He then filed an answer and a counterclaim for damages under a variety of legal theories, including breach of contract and quantum meruit.

B.

At trial, both men acknowledged that they made an oral agreement to renovate the existing house. But there was little or no consensus as to the specific terms of their agreement or their subsequent dealings.

2

Mr. Gamble maintained that their agreement was contingent on Mr. Friend completing the renovations for $30,000 in six months. That did not happen. He gave Mr. Friend more than five years to complete the renovations and spent "five times" what he had planned. Even so, the project "just went on and on, and nothing got done." Mr. Gamble believed that this was because Mr. Friend spent most of his time working on his own projects instead of completing the renovations.

Mr. Friend denied that Mr. Gamble's payment obligation was limited. In his view, Mr. Gamble had agreed to fund the renovations for "as long as the process took." He blamed the slow pace of the work on inadequate funding. Due to this lack of funds, he provided the bulk of the renovation materials himself. Among other things, he paid for "all the doors, the windows, [and] certain parts of the lumber." He also supplied the electrical and plumbing materials and HVAC pipes. Yet he had no receipts or other documentation of the materials he claimed to have contributed. He was "cash and carry" and did not "collect receipts."

Mr. Friend was not a licensed contractor. He described himself as a "jack of all trades." He primarily worked on electrical and HVAC systems. Still, he professed to be well-versed in construction, having worked in the business "pretty much his whole life."

According to Mr. Friend, he "gutted" the old house and rebuilt it "from the ground up." The renovations on the house were, in his opinion, 90 to 95 percent done. He estimated that it would cost another $40,000 to complete them; most of that cost was for a new roof. Because he had effectively built a new house, he contended that the value of his work equated to the fair market value of the house minus $40,000 for the remaining work. He calculated the fair market value of the home at $452,709 based on what he claimed was the going rate for houses in that area.

Mr. Friend also sought compensation for the value of his labor and the cost of the materials he used to build the efficiency apartment he used as his residence and a garage he built after the litigation began. He denied that any of Mr. Gamble's funds were expended on these outbuildings. According to Mr. Friend, he routinely collected various types of building materials. He used "like $49,000" worth of materials from his collection to build the apartment. He estimated the value of his labor at $30,000. As for the garage, he thought he contributed "about $30,000" in materials and $20,000 in labor. When asked how he arrived at these figures, he replied, "as long as I have been in construction, I pretty much know what things cost."

As the final element of his claimed damages, Mr. Friend requested "$110,000 for seven years [of mowing services]." He asserted that this was based on the going rate for mowing this type of property. According to Mr. Friend, he initially devoted several hours a day to mowing the extensive property, but gradually reduced the mowing area to around

an acre.  Yet he acknowledged that Mr. Gamble never asked him to mow the property.  He did it simply "because [he was] living there."

Mr. Gamble presented the expert testimony of a licensed general contractor with extensive experience in home construction as a rebuttal witness.  The contractor visited the house three times along with a licensed electrician and a licensed HVAC contractor.  Unlike Mr. Friend, the contractor believed the renovations were only forty to fifty percent complete.  He identified several areas that required remediation, either because of defective work or water damage from the leaking roof.  In his expert opinion, it would cost an additional $179,000 to complete the home, including remediation.

**II.**

The trial court granted Mr. Gamble his requested detainer and dismissed Mr. Friend's counterclaims for lack of proof.  On appeal, Mr. Friend only challenges the dismissal of his counterclaims for breach of contract and quantum meruit.  Because this was a bench trial, we review the trial court's factual findings de novo on the record, with a presumption of correctness unless the evidence preponderates otherwise.  TENN. R. APP. P. 13(d).  We review questions of law de novo, with no presumption of correctness. *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

A.

One of the essential elements of a breach of contract claim is "the existence of a valid and enforceable contract." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).  The party seeking to enforce an oral agreement must prove both "mutual assent" to the contract terms and that the terms "are sufficiently definite to be enforceable." *Castelli v. Lien*, 910 S.W.2d 420, 426-27 (Tenn. Ct. App. 1995).  We use an objective test to determine mutual assent based on the parties' outward manifestations.  *T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002).  But mutual assent cannot be established from "an ambiguous course of dealing between the two parties from which differing inferences . . . might reasonably be drawn." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990).  An indefinite essential term "may prevent the creation of an enforceable contract." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (quoting *Jamestowne on Signal, Inc.*, 807 S.W.2d at 565). Contract terms are "reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Jamestowne on Signal, Inc.*, 807 S.W.2d at 564 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33 (AM. L. INST. 1981)).

We conclude that Mr. Friend failed to prove mutual assent to sufficiently explicit contract terms to form an enforceable contract.[2]  *See Doe,* 46 S.W.3d at 196.  In broad strokes, Mr. Friend agreed to oversee the renovations and Mr. Gamble agreed to provide funding.  Beyond this general agreement, there was no consensus as to any specific terms, such as "the scope of the work, the cost, and the time for performance."  *Castelli*, 910 S.W.2d at 427.  The parties disagreed at trial over the timing and amount of Mr. Gamble's payment obligation and the expected time frame for the renovations.  Nor can we glean mutual assent to reasonably certain terms based on their inconsistent course of dealing over the ensuing six years.

B.

Quantum meruit is an equitable substitute for a breach of contract claim.  *Doe*, 46 S.W.3d at 197-98.  It applies when (1) there is no enforceable contract covering the subject matter, (2) the party seeking recovery provided valuable goods or services to another, (3) the other party received the goods or services, (4) the receiving party should have reasonably understood that the providing party expected to be compensated, and (5) it would be unjust for the receiving party to retain the goods or services without payment.  *Id.*

The party asserting the right to recover under quantum meruit "must carry the burden of proving the value of the work performed."  *John J. Heirigs Constr. Co., Inc. v. Exide*, 709 S.W.2d 604, 607 (Tenn. Ct. App. 1986).  There is "[n]o precise formula . . . for determining the reasonable value [of goods or services]."  *Castelli*, 910 S.W.2d at 430.  The evidence "need not be exact."  *In re Est. of Marks*, 187 S.W.3d 21, 32 (Tenn. Ct. App. 2005).  But it "must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages."  *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006).  As the party seeking damages, it was Mr. Friend's responsibility to "lay[ ] a sufficient foundation" for his claimed damages.[3]  *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012) (citation omitted).

---

[2] Mr. Gamble contends that the oral agreement is unenforceable under Tennessee's statute of frauds.  *See* Tenn. Code Ann. § 29-2-101(a)(4) (2024) (prohibiting any action on a "contract for the sale of lands . . . unless the promise or agreement . . . [is] in writing, and signed by the party to be charged").  Because we conclude that the breach of contract counterclaim was properly dismissed on other grounds, we need not address this argument.

[3] Mr. Gamble argues that, as an unlicensed contractor, Mr. Friend can only recover his "actual documented expenses" established by "clear and convincing proof."  *See* Tenn. Code Ann. § 62-6-103(b) (2019); *Kyle v. Williams*, 98 S.W.3d 661, 665 (Tenn. 2003).  Because Mr. Gamble waited until after trial to assert this affirmative defense, it has been waived.  *See Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 739 (Tenn. 2013) (recognizing that an affirmative defense is waived "if not timely raised"); *Admin. Res., Inc. v. Barrow Grp., LLC*, 210 S.W.3d 545, 556 (Tenn. Ct. App. 2006) (defining an "affirmative defense" as "a matter that is not within the plaintiff's prima facie case" (quoting *George v. Alexander*, 931 S.W.2d 517, 527 (Tenn. 1996) (Reid, J., concurring))).

The court found that Mr. Friend "failed to prove the value of his efforts and materials which improved the Property, the extent to which the Property was actually improved, if at all, and whether the value exceeded the value imparted upon Mr. Friend by his extended residence on the Property." It gave "very little credit to Mr. Friend's testimony on damages." In the court's view, his estimates of the value of his services amounted to little more than guesswork. He made no attempt to support his claims with any objective facts. And his explanation of the value of his mowing services "def[ied] common sense." Given the "exaggeration, the lack of objective support, and absence of documentary evidence[,]" the court found his damages testimony to be unreliable. And it implicitly rejected his testimony as to the value of the unfinished house, finding that "[s]ubstantial effort and funds would be needed to make the home habitable."

The evidence does not preponderate against these findings. Mr. Friend relied solely on his own testimony, which the trial court did not find credible. We afford great deference to the court's credibility finding because "[t]he weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact." *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 233 (Tenn. Ct. App. 2009). We will not disturb the court's finding on this record. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Mr. Friend made no attempt to explain how he arrived at his value estimates, claiming simply that he "pretty much kn[e]w what things cost" based his time in the industry. Yet he gave few, if any, details of relevant prior experience. He provided no time records, bills of sale, receipts, or other documentation to support his claimed values. And the expert testimony cast severe doubt on his valuation of his work on the existing house.

Finally, Mr. Gamble seeks damages for defending against a frivolous appeal. *See* Tenn. Code Ann. § 27-1-122 (2017) (granting an appellate court discretion to award attorney's fees when an appeal is frivolous or taken solely for delay). An appeal is frivolous when it is "devoid of merit" or "has no reasonable chance of succeeding." *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003). This appeal was not devoid of merit; it was unsuccessful, not frivolous. *See Coolidge v. Keene*, 614 S.W.3d 106, 120 (Tenn. Ct. App. 2020). So we decline to award fees for a frivolous appeal.

### III.

Mr. Friend failed to prove the existence of a valid, enforceable contract or the value of the work he performed. So we affirm the trial court's judgment.

_____
s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE