FILED
09/17/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 10, 2024 Session

## BUCHANAN DOBSON DUNAVANT v. THE WILLIAM B. DUNAVANT, JR. REVOCABLE LIVING TRUST ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-3895-20     Rhynette N. Hurd, Judge**

———————————————————

**No. W2023-01213-COA-R3-CV**

———————————————————

At issue in this appeal is the petitioner's attempt to recover for breach of contract of a marital dissolution agreement entered into between his parents prior to their divorce. Although the parents' agreement had called for the petitioner's father to create an irrevocable life insurance trust for the petitioner's benefit, the trial court concluded that there was not an enforceable obligation regarding that subject matter and entered summary judgment. For the reasons stated herein, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

William F. Burns, Frank L. Watson, III, William E. Routt, John S. Golwen and A. Alex Agee, Memphis, Tennessee, for the appellant, Buchanan Dobson Dunavant.

Jef Feibelman and L. Mathew Jehl, Memphis, Tennessee, for the appellees, The Estate of William B. Dunavant, Jr., and The William B. Dunavant, Jr. Revocable Living Trust.

## OPINION

## BACKGROUND

Buchanan Dobson Dunavant ("the Petitioner") is the adult son of Lillian Dobson Dunavant and William B. Dunavant, Jr. In May 1975, the Petitioner's parents were divorced, and in connection with their divorce, they entered into a marital dissolution

agreement ("the MDA").[1]  As is of relevance to this appeal, the MDA contained provisions that addressed the "Inheritance" of the Petitioner as well as that of his four older siblings. In pertinent part, the MDA provided as follows:

3. Children's Inheritance.

(a) Children's Trusts.

It is acknowledged that Husband was grantor of four Trusts for the four older children, which Trusts have as assets certain stock of Dunavant Enterprises, Inc. and other assets. Wife was designated as Trustee and, by agreement of the parties, it is agreed that Samuel T. Reeves and wife, Elizabeth Reeves, will serve as Successor Co-Trustees of said Trusts, with the right of substitution to arise in Wife in the event of the death of Husband.

(b) Inheritance of Buchanan Dobson Dunavant.

It is acknowledged that Buchanan Dobson Dunavant (Buck) was not born when the above Trusts were created, and in order to equalize the inheritance, Husband has arranged to provide life insurance for his benefit. In order to confirm this arrangement, Husband will create an irrevocable life insurance trust to receive insurance proceeds for Buck's benefit. This Trust will provide that, from the first proceeds paid on death, the Trustee will hold for Buck's benefit an amount equal to the average of the after-tax funds received from the other four Trusts.

. . . .

(d) Inheritance.

Husband hereby acknowledges that none of his five children will be arbitrarily disinherited.

. . . .

---

[1] Although the document at issue is titled "Marital Settlement Agreement," we employ the MDA designation consistent with the presentation utilized by the parties and the trial court in this case.

> 6. **Life Insurance.**
>
> Husband shall have no further responsibility with regard to life insurance except:
>
> (a) To maintain the insurance for the benefit of Buck, above described, and
>
> (b) To fund an amount necessary to complete the periodic alimony payments due hereunder, in the event of Husband's death before such payments have been completed.

The present litigation commenced in September 2020 when the Petitioner filed suit against his father in the Shelby County Circuit Court ("the trial court"). The Petitioner asserted his status as "a third-party beneficiary of the MDA" and alleged that his father had breached the requirement highlighted above pertaining to the creation of an irrevocable life insurance trust. In the prayer to his petition, the Petitioner requested a declaratory judgment, damages for breach of contract, and an accounting.

During the pendency of the litigation, the Petitioner's father died, and the co-trustees of the "William B. Dunavant, Jr. Revocable Living Trust" were thereafter substituted as parties. Later, in August 2022, the "Estate of William B. Dunavant, Jr.," through its personal representative, was also added as a party by way of consent order.[2]

Although initial, competing motions for summary judgment were denied by the trial court in 2022, additional summary judgment practice ensued the following year. Of note, the Petitioner filed a motion for summary judgment as to liability on April 28, 2023. As outlined in a supporting memorandum, the Petitioner argued that undisputed facts established that the Petitioner's father had "breached paragraphs 3(b) and 6(a) of the MDA, causing damages to Petitioner," and thus, the Petitioner contended that he was "entitled to summary judgment as a matter of law at the liability stage of this action." This view of the case was not shared by the opposing side, however, and on June 15, 2023, the William B. Dunavant, Jr. Revocable Living Trust, through its trustee, and the Estate of William B. Dunavant, Jr., through its personal representative, (collectively, "the Respondents"), filed their own motion for summary judgment. In part, the Respondents argued that (1) the MDA "is simply too vague and uncertain to be enforceable" and (2) even if there is an otherwise enforceable obligation, "the undisputed facts show that [the Petitioner's father] had numerous non-arbitrary reasons to disinherit Petitioner."[3] In attempting to provide a

---

[2] The same order also dismissed one of the former trustees of the William B. Dunavant, Jr. Revocable Living Trust as a party, citing that individual's "resignation as Co-Trustee."

[3] Another argument made by the Respondents in support of summary judgment (which hinged on alleged inaction of the Petitioner's mother and was ultimately rejected by the trial court) is not at issue in

foundation for the propriety of asserting this latter point, the Respondents, in a supporting memorandum, pointed to the language in paragraph 3(d) of the MDA, which they argued afforded Husband the "right to non-arbitrarily disinherit any of his children."

Regarding the first basis upon which they grounded their latest summary judgment motion, the Respondents focused on the notion that the MDA was "missing key terms." In articulating their position on this matter in their supporting memorandum, the Respondents contended that the MDA was "very poorly drafted" and that the "provisions at issue are simply too vague and uncertain to be enforceable because there is no way to determine whether [the Petitioner's father] breached the agreement." In addition to generally taking issue with the MDA's failure to identify a trustee or specific life insurance policy, its failure to describe at what point, if any, funds would actually be distributed to the Petitioner, and its failure to contain standards that would govern a trustee's discretion in making distributions, the Respondents emphasized, among other things, that the MDA "does not specify the amount of life insurance." Nor did the MDA, the Respondents argued, contain a deadline related to the trust contemplated for the Petitioner. According to the Respondents concerning the insurance amount issue specifically, without an amount, there was "no way to measure the obligation of [the Petitioner's father]."

Whereas the Petitioner maintained that an amount of life insurance to fund the trust was specified by way of the MDA's reference to "an amount equal to the average of the after-tax funds received from the other four Trusts," the Respondents argued that said reference did not provide a practicable method for determining the amount of life insurance the Petitioner's father had already "arranged to provide." In the course of making their argument, the Respondents noted that the trusts for the Petitioner's siblings contained a different category of assets and "operated on a different timeline." As to this latter point, the Respondents submitted that "the trusts of Petitioner's siblings terminated when each reached age 30, but Petitioner's siblings did not receive 'funds' at this time and instead they received Dunavant Enterprises, Inc. stock."

Further, whereas the Petitioner had argued that the purpose of the provisions at issue "was to ensure that, upon the Deceased's death, Petitioner would receive insurance funds equal to the average after-tax **distributions** that had been made to the Older Siblings from their respective trusts up to the Deceased's date of death," and generally advocated for the relevancy of considering the money the older siblings had, according to the Petitioner, received in 2012 after the Petitioner's father invoked a stock redemption plan, the Respondents rejected the viability of such an argument as follows:

> Not only is Petitioner's reading different from the actual language of the MDA, but it also makes no logical sense and is contrary to the express language in the MDA. Consider Petitioner's actual argument: even though

this appeal. We thus limit our reference to it here.

Petitioner's siblings' trusts terminated at age 30, [the Petitioner's father] then had an obligation to keep up with the redemptions of the stock previously held by the siblings' trusts and then to keep buying life insurance to make sure that Petitioner received that amount of life insurance. First, this argument fails logically. Consider: what if [the Petitioner's father] died before his children redeemed their stock? In that scenario, with no stock actually being redeemed, there would have been no possible way to calculate the "amount" term for Petitioner under Petitioner's reading of the MDA.

Meanwhile, Petitioner's argument is also contrary to the express language of the MDA, which unambiguously states that [the Petitioner's father] "shall have no further responsibility with regard to life insurance except: (a) To maintain the insurance for the benefit of [the Petitioner], above described . . . ." According to the language of the MDA, [the Petitioner's father] had **no further responsibility** to buy life insurance for Petitioner and merely needed to "maintain" what had already been arranged, and, thus, Petitioner's reading that [the Petitioner's father] would have had to keep buying life insurance to keep up with stock redemptions from Petitioner's siblings is untenable when one examines the actual language of the MDA. This language was not a mistake and is in direct contrast to the very next clause, which requires [the Petitioner's father] to keep buying life insurance to ensure that he can meet his alimony payments to [the Petitioner's mother] even if [the Petitioner's father] died early . . . .

(internal footnote and internal citation omitted). The Respondents further suggested the trial court consider "another hypothetical": "what if Dunavant Enterprises, Inc. went out of business and the stock was worthless before it was sold? Under that reading, Petitioner would have been entitled to nothing according to Petitioner's interpretation."

Although the Respondents argued that the MDA provisions were simply too "vague," "indefinite," "unusual," and "unbusinesslike" to be enforceable,[4] the Petitioner

---

[4] The Respondents' argument on this matter was couched in the terminology of a prior decision of this Court, which stated in relevant part as follows:

This alleged contract is too vague and indefinite for enforcement; and it is so unusual and unbusinesslike as to raise a doubt of the seriousness of the contention. If such were the contract it could have been incorporated in the original trust deed; there was no definite amount fixed as to what would be required to complete the building, and it is insisted now that Jones did not use the original $1000 in construction of the building, but he used it for other purposes. How could a court determine the amount of future damages? There is nothing to indicate a meeting of the minds upon the terms of any such agreement.

*Lyons v. Jones*, 121 S.W.2d 125, 129 (Tenn. Ct. App. 1938).

argued that the trial court should reject this argument, as well as others that the Respondents had lodged in support of a request for summary judgment. The MDA's provisions, he claimed, were "sufficiently definite" to be enforceable, and according to him, instead of the trial court entering summary judgment in the Respondents' favor, the court should require that the case "proceed promptly to complete discovery quickly and for a trial on the question of damages."

The trial court ultimately ruled in favor of the Respondents and held that they were entitled to summary judgment on two bases. First, the trial court held that the provisions at issue were not enforceable, opining that "there is no way to determine the parties had a meeting of the minds about what was required of [the Petitioner's father] to achieve the intended result." Indeed, as the trial court viewed the MDA, there were "omissions in the contract and the mechanism for quantifying Petitioner's inheritance." The trial court placed particular emphasis on the fact that the MDA did not specify a time for the Petitioner's father's performance nor the amount of insurance he was to procure.[5]

As a second basis for the entry of summary judgment in the Respondents' favor, the trial court held that, "even if [the relevant provisions of the MDA] were enforceable, [the Petitioner's father] could and had cause to disinherit Petitioner." In connection with the grant of the Respondents' motion for summary judgment on these bases, the Petitioner's motion for summary judgment was of course denied.[6] This appeal followed.

## ISSUES PRESENTED

In his raised issues on appeal, the Petitioner first requests this Court to address whether the trial court erred by denying his motion for summary judgment as to liability and by granting the Respondents' second motion for summary judgment. In specifically broaching the two bases on which the trial court granted summary judgment in favor of the Respondents, he asks the following two questions, which we have slightly restated:

(1) Did the trial court err by granting the Respondents' second motion for summary judgment on the ground of unenforceability?
(2) Did the trial court err by granting the Respondents' second motion for summary judgment on the ground that the Petitioner's father was relieved of his obligations under the MDA based on a provision that prohibits arbitrary disinheritance?

---

[5] In the "Background" section of its order, the trial court had noted that the MDA was silent on multiple other matters. In addition to noting that the MDA "does not give a time frame for . . . performance nor a definite or calculable amount for the life insurance corpus," the court observed that the MDA did not name a trustee regarding the Petitioner's trust, was silent about any details of the life insurance, and did not mention when a trustee was to release any funds.

[6] In the language of the trial court, the Petitioner's motion was "DENIED as moot."

In further referencing discovery disputes that arose during the pendency of the litigation below, the Petitioner also generally asks this Court to address whether the trial court abused its discretion by "imposing material limitations on [the Petitioner's] right to conduct discovery and by denying [the Petitioner] access to relevant, non-privileged information."

For their part, the Respondents do not raise any issues in this appeal, and they submit that we should affirm the trial court's grant of summary judgment because, in their view, "the MDA provisions are simply too indefinite and uncertain to be enforceable." They also contend that, "[a]lternatively, this Court should find that [the Petitioner's father] had the right not to create the trust at issue because he had numerous non-arbitrary reasons to disinherit Petitioner." Although the Respondents further maintain that this Court should affirm the trial court's decisions on discovery issues, they also contend that we actually need not address the Petitioner's raised discovery grievance if we affirm the trial court's decision on summary judgment, noting that "Petitioner did not file a Rule 56.07 Affidavit in response to Respondents' Second Motion for Summary Judgment and has failed to demonstrate how any of the discovery would have changed the Court's decision."

**STANDARD OF REVIEW**

Primarily at issue in this appeal is the trial court's decision to grant summary judgment in favor of the Respondents. In assessing the propriety of this action, we are guided by the following standard:

> A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry.,* 271 S.W.3d 76, 83 (Tenn.2008) (citation omitted). When the moving party does not bear the burden of proof at trial, "the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC,* 477 S.W.3d 235, 264 (Tenn. 2015). Because resolving a motion for summary judgment is a question of law, we review the trial court's disposition on the issue *de novo* without a presumption of correctness.

*Bobo v. City of Jackson*, 511 S.W.3d 14, 18 (Tenn. Ct. App. 2015).

**DISCUSSION**

Through this appeal, the Petitioner maintains that the trial court erred in denying his motion for summary judgment as to liability and that it erred in granting summary judgment in favor of the Respondents. As discussed earlier, the trial court's decision to grant summary judgment in favor of the Respondents was predicated on two bases. First, the trial court held that summary judgment was appropriate due to its opinion that the provisions at issue were "unenforceable." Second, the trial court held that, "even if [the relevant provisions of the MDA] were enforceable, [the Petitioner's father] could and had cause to disinherit Petitioner." For the reasons stated below, we agree with the trial court's conclusion pertaining to unenforceability and therefore find no error with its ultimate decision to enter summary judgment in the case.[7]

Although "traditional privity rules provided that those who were not parties to a contract had no right to sue for its breach," third parties may, under the modern rule, "enforce a contract if they are intended beneficiaries of the contract." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001). As part of the required showing to maintain an action as an intended beneficiary, the third party must show that a valid contract was made between the principal parties. *Id.* Here, of course, the Petitioner is specifically attempting to predicate his personal recovery on the MDA. It is well settled that "[i]nterpretation of an MDA is subject to the rules of construction governing contracts . . . ." *Schmidt v. Ankrom*, No. E2017-01909-COA-R3-CV, 2018 WL 4148132, at *2 (Tenn. Ct. App. Aug. 29, 2018).

One of the central concerns in this case relates to the enforceability, or lack thereof, of the contemplated obligation under the MDA for the Petitioner's father to create an irrevocable life insurance trust. In Tennessee, "an enforceable contract must, among other elements, result from a meeting of the minds and must be sufficiently definite to be enforced." *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990). As this Court has explained by quoting to the Restatement:

> Even though a manifestation of intention is intended to be understood as an
> offer, it cannot be accepted so as to form a contract unless the terms of the

---

[7] In connection with our disposition, we pretermit consideration of the second basis for summary judgment that the trial court relied upon in the alternative. Further, we are of the opinion that our decision to affirm the trial court's holding regarding unenforceability obviates any need to consider the Petitioner's general complaints about how the trial court handled discovery. It is unclear how an inquiry into that matter has any bearing on the specific issue involved at the center of our affirmance of the trial court; moreover, as the Respondents have observed, the "Petitioner did not file a Rule 56.07 Affidavit in response to Respondents' Second Motion for Summary Judgment." As the Tennessee Supreme Court has explained, "If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015).

contract are reasonably certain.

> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Id.* (quoting Restatement (Second) of Contracts § 33). Simply put, case law is instructive that a contract "must be sufficiently explicit so as to enable a court to determine the respective obligations of each party." *Tetra Tech, Inc. v. Performa Ent. Real Estate, Inc.*, No. W2007-02244-COA-R3-CV, 2008 WL 4457061, at *5 (Tenn. Ct. App. Oct. 3, 2008). Indeed, the terms must not be so uncertain so as to prevent the court from "deciding whether the agreement has been kept or broken." *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991).

In view of the above standards, we agree with the trial court that the provisions at issue are unenforceable. Namely, it is respectfully unclear to us how to assess what exactly was required of the Petitioner's father, especially with respect to the amount of insurance he was required to procure. The MDA's terms do not chart a clear or specific course for him to follow. In our view, the widespread uncertainty that exists as to this matter is primarily attributable to the absence of a specific life insurance amount and the otherwise generalized, nonspecific reference included in the MDA regarding "an amount equal to the average of the after-tax funds received from the other four Trusts."

Indeed, it is initially clear that the MDA does not itself articulate a specific monetary amount of life insurance that the Petitioner's father is obligated to procure regarding the contemplated trust. The Petitioner, however, has maintained that the MDA does specify the amount of life insurance required to fund the trust, and in the trial court, he contended specifically as follows regarding his denial of the asserted fact that the "MDA does not specify the amount of life insurance to fund the trust": "The MDA specifies that the amount of life insurance to fund the trust discussed in Paragraph 3(b) shall be 'an amount equal to the average of the after-tax funds received from the other four Trusts.'" As discussed below, we are of the view that this provision does not in any way eliminate the uncertainty attendant to deciphering the obligation of the Petitioner's father.

As evidenced just above, the amount of insurance required to fund the contemplated trust, in the Petitioner's own view of the case, relates to the amount of funds "received" from the other four referenced trusts. Yet, even accepting that premise as true, the question begs: *received as of when*? Received as of the MDA's signing? Received as of some earlier other point in time? When is the valuation made? The MDA does not provide any immediate direction regarding this issue, and it is thus unclear as to how we are to assess

what the purported obligation of the Petitioner's father was regarding the life insurance he had "arranged."

It appears to be the Petitioner's position that the referenced funds "received" should themselves be measured, for the purpose of determining the totality of the required insurance funding, as of the date of the death of his father. Indeed, in the Petitioner's attempt to pinpoint what the obligation of his father supposedly was under the MDA, he appears to assume that the ultimate amount of insurance required for the funding of the trust could be a figure that might not be calculable at the onset of the initial procurement of insurance. That is, his position appears to be reliant on the notion that his father was required to ensure that the amount of insurance itself increased as funds were received from the Petitioner's siblings' trusts, even after insurance had already been procured in connection with the contemplated obligation to create the life insurance trust under the MDA.[8] In relevant part, for instance, the Petitioner argues in his principal appellate brief as follows: "Although [the Petitioner's father] was not permitted under the law to revoke or decrease the value of the Irrevocable Trust, he could add to it to ensure that the value of the Irrevocable Trust equaled the after-tax funds received from the Older Siblings' trusts." While the Petitioner may desire for such an obligation to exist under the MDA, we respectfully are of the opinion that it requires reading in language that is not present. Indeed, the contemplated obligation of the Petitioner's father under the MDA, however indefinite and uncertain it otherwise is as discussed elsewhere herein, simply does not purport to entail any sort of ongoing obligation to purchase additional insurance. In fact, the MDA contains language signaling an understanding that the insurance initially procured is simply to be maintained. As the Respondents persuasively argue in their principal appellate brief concerning this matter:

> [T]he express language of the MDA is contrary to Petitioner's suggestion that [the Petitioner's father] would have needed to add life insurance to the contemplated trust to keep up with stock redemptions. Paragraph 3(b) of the MDA states that [the Petitioner's father] "has arranged to provide life insurance for [Petitioner's] benefit" while Paragraph 6(a) states that [the Petitioner's father] "shall have no further responsibility with regard to life insurance except: (a) To maintain the insurance for the benefit of [the Petitioner], above described . . . ."

(fourth alteration in original and omission in original). Thus, the Respondents explain, the Petitioner's father had no further responsibility to buy life insurance but instead simply needed to maintain what had already been arranged. Again, based on the language of the MDA, we agree that the MDA does not contemplate the ongoing purchase of insurance.

---

[8] Thus, the Petitioner's argument clearly appears to treat the Petitioner's father's initial procurement of insurance as something that might be in an amount that is lower than what the totality of his ultimate funding obligation is deemed to be.

- 10 -

Of course, notwithstanding what we can glean from the MDA on that question, little clarity can be found elsewhere. The fundamental problem here, as already discussed, is that there is a lack of definitiveness and specificity regarding what exactly the MDA's terms require of the Petitioner's father pertaining to the initial procurement of life insurance and funding of the trust. The MDA does not specify an amount of life insurance that the Petitioner's father is obligated to procure,[9] and again, even if the yardstick for measuring the amount of required life insurance is, as the Petitioner generally submits, "an amount equal to the average of the after-tax funds received," received as of what date? That question is left open through an absence of sufficient specificity in the contracting terms, and the lack of reasonable certainty regarding an insurance amount term inhibits us from being able to determine the existence of a breach and for giving any appropriate remedy to the Petitioner.

Another consideration surrounding this general issue, i.e., whether the obligation in dispute is sufficiently certain so as to provide a basis for determining the existence of a breach and for giving an appropriate remedy, has been raised by the Respondents in relation to the MDA's failure to address any distribution terms that would govern the trust. In the course of discussing this matter in their appellate brief, the Respondents also specifically accuse the Petitioner of adding in ideas to the MDA to avoid its uncertainty. Indeed, whereas the Petitioner had argued in his principal brief that the parties to the MDA "expressed that the purpose of paragraphs 3(b) and 6(a) [of the MDA] was to ensure that, upon [the Petitioner's father's] death, [the Petitioner] would receive insurance funds equal to the average after-tax **distributions** that had been made to the Older Siblings from their respective trusts up to [the Petitioner's father's] date of death," the Respondents note that the MDA actually "says no such thing." When elsewhere pondering the lack of any defined standards for distribution within their brief, the Respondents characterize the MDA as simply "an agreement to agree on the future terms of the trust." This argument from the Respondents raises another interesting question concerning the uncertainty connected to the contemplated obligation. Indeed, even assuming, arguendo, that we were able to discern the amount of insurance that was required to be held in trust, in what specific way was the Petitioner to benefit from it? In what respect should relief be granted to him now?

As we noted earlier, when the trial court held that the provisions at issue were not enforceable, it opined that "there is no way to determine the parties had a meeting of the minds about what was required of [the Petitioner's father] to achieve the intended result." We are of the opinion that this conclusion finds support in the uncertainty we have discussed herein, particularly concerning the lack of a sufficiently explicit insurance amount term. In our view, the MDA is simply "so unusual and unbusinesslike" regarding how the contemplated trust is to be funded by insurance, *Lyons v. Jones*, 121 S.W.2d 125, 129 (Tenn. Ct. App. 1938), and in light of our conclusion that it is fundamentally too vague

---

[9] Nor does the MDA, as the Respondents have emphasized, identify a specific life insurance policy or policies.

and indefinite to be enforceable, we find no error in the trial court's decision to enter summary judgment in favor of the Respondents.

## CONCLUSION

In light of the foregoing discussion, we affirm the trial court's entry of summary judgment in favor of the Respondents and remand the case for such further proceedings that are necessary and consistent with this Opinion.

_s/ Arnold B. Goldin_
ARNOLD B. GOLDIN, JUDGE
